## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREW PORWANCHER

SCETL–ASU
P.O. Box 870602
Tempe, Arizona 85287–0602
(602) 726-2110

*Plaintiff,*

v.

NATIONAL ENDOWMENT FOR THE
HUMANITIES; and

MICHAEL MCDONALD, in his official
capacity as Acting Chairman; and

UNITED STATES DEPARTMENT OF
GOVERNMENT EFFICIENCY,

*Defendants.*

Case No.

Case: 1:25–cv–01180
Assigned To : Nichols, Carl J.
Assign. Date : 4/16/2025
Description: Pro Se Gen. Civ. (F–DECK)

## <u>COMPLAINT</u>

1.  Professor Andrew Porwancher was thrilled to receive word in August 2024 from the National Endowment for the Humanities (NEH): he had been selected for a prestigious Public Scholar grant. That award would fund a book project on a topic of great significance to Porwancher personally and to the public generally: combatting antisemitism. Thanks to the award, Porwancher's university would afford him a year's reprieve from teaching duties so that he could enjoy twelve uninterrupted months of writing. This opportunity would drastically accelerate his timeline for completing his book and for receiving all the benefits that flow from publication—a book deal, speaking engagements, and career mobility. Moreover, the cachet of the Public Scholar award is a good in and of itself, and it promised to bring Porwancher yet more opportunities for professional distinction.

RECEIVED

APR 16 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

2.      On April 3, 2025—with Professor Porwancher set to begin his performance period in August 2025—the NEH summarily terminated his grant. His award was among more than one thousand grants that were terminated in a mass purge at the NEH that also saw most staffers fired. The Termination Notice that the NEH sent to Professor Porwancher made a mockery of its legal obligations to him, forgoing procedural protections required by NEH regulations. The Notice was also the epitome of arbitrary and capricious action. For instance, the Notice claimed without explanation that Porwancher's book project—on combatting antisemitism—no longer effectuates the agency's priorities or President Trump's agenda. Porwancher could only conclude that one of two things must be true: either Defendants did not actually have a basis for terminating his grant or the Trump Administration had abandoned its commitment to fighting Jew-hatred.

3.      Defendants are now moving to reallocate funds from terminated grants to other projects, threatening to foreclose the possibility that Porwancher's award could be reinstated even if its termination were deemed unlawful. Absent injunctive relief from this Court, Professor Porwancher will suffer irrevocable harm. The grant termination will upend his carefully laid plans for the performance period of his award. It will also deprive Porwancher of the reputational benefits and timely completion of his book that his Public Scholar award would have afforded him. Given these imminent and irreparable harms, Professor Porwancher files this Complaint and will seek preliminary relief enjoining Defendants from reallocating his funds and directing Defendants to reinstate his grant until this Court has an opportunity to more fully consider the issues on the merits.

## PARTIES

4.    **Plaintiff Andrew Porwancher** is a Professor of History in a department called the School of Civic and Economic Thought and Leadership at Arizona State University (ASU) in Tempe, Arizona.

5.    **Defendant National Endowment for the Humanities (NEH)** is a federal agency headquartered in Washington, D.C.

6.    **Defendant Michael McDonald** is the Acting Chairman of the NEH. He is sued in his official capacity.

7.    **Defendant United States Department of Government Efficiency (DOGE)** is an organization within the Executive Office of the President.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

9.    Venue is proper in this District under 28 U.S.C. § 1391(e) because the NEH is headquartered in this District.

## LEGAL FRAMEWORK

10.    Congress passed the National Foundation on the Arts and the Humanities Act of 1965, therein creating the NEH. 20 U.S.C. § 956. In explaining the purposes of the legislation, Congress declared that "the humanities belong to all the people of the United States." *Id.* § 951(1). Congress emphasized the importance of history specifically: "An advanced civilization must . . . achieve a better understanding of the past." *Id.* § 951(3). "While no government can call a great . . . scholar into existence, it is necessary and appropriate for the Federal Government to help create

and sustain . . . the material conditions facilitating the release of this creative talent." *Id.* § 951(7). To that end, Congress contemplated the provision of "grants . . . to . . . support the publication of scholarly works in the humanities." *Id.* § 956(c)(8).

11.    The NEH's Research Programs division provides an array of grants for individuals. These include the Public Scholars program, which "supports nonfiction books in the humanities that hold strong appeal for curious general readers[.]"[1]

12.    The administration of NEH grants is governed by the set of regulations known as the Uniform Administrative Requirements (UAR). 2 C.F.R. §§ 200.0 *et seq*. The UAR were originally promulgated by the Office of Management and Budget (OMB) and subsequently adopted by the NEH. 2 C.F.R. § 3374.1. Although OMB updates to those regulations became effective on October 1, 2024, the NEH opted not to apply the new regulations retroactively to extant grantees.[2] Therefore, grantees such as Professor Porwancher (whose funds were obligated in August 2024) are governed by the regulations that became effective on November 12, 2020.

13.    Under those 2020 regulations, the NEH can terminate an award without the recipient's consent for three reasons: (1) the recipient "fails to comply with the terms and conditions of [the] Federal award," (2) "pursuant to termination provisions included in the Federal Award," or (3) "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a) (2020).

14.    OMB's 2020 *Guidance for Grants and Agreements* explains that this latter provision is triggered when an agency learns new information about an existing grantee's award that renders it incompatible with the program goals or agency priorities: "For instance, following

---

[1] NEH, *Fiscal Year 2024 Congressional Justification* 52 (March 2023), https://tinyurl.com/FY24budgetrequest.
[2] NEH, *Update on the 2024 Revisions to 2 CFR 200* (June 25, 2024), https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200.

the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award. Further, additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award, such that it may be in the interest of the government to terminate the Federal award." OMB, *Guidance for Grants and Agreements*, 85 Fed. Reg. 49506, 49507-08 (Aug. 13, 2020).

15.    The 2020 OMB Guidance further states that "Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." 85 Fed. Reg. at 49507.

16.    The 2020 Regulations also provide specific procedures that the NEH must follow if it terminates a grant for failure to comply with the terms and conditions of the award.

17.    First, the NEH must "determine that noncompliance cannot be remedied by imposing additional conditions" on the award. 2 C.F.R. § 200.339(c) (2020) (providing that the NEH "may wholly or partly suspend or terminate the Federal award," but only "[i]f the [NEH] . . . determines that noncompliance cannot be remedied by imposing additional conditions").

18.    Second, the NEH "must provide the [recipient] an opportunity to object and provide information and documentation challenging the suspension or termination action, in accordance with written processes and procedures published by [NEH]." *Id.* § 200.342.

19.    Third, the NEH "must provide . . . a notice of termination" that "must" furnish multiple pieces of information, *id.* § 300.341, including that:

      a.    the "termination decision will be reported to [an] OMB [database]";

b.  the termination decision "will be available in the OMB [database] for a period of five years";

c.  other agencies that consider future grant applications from the recipient "must consider [the termination decision] in judging whether the [recipient] is qualified to receive" another federal award;

d.  the recipient of the terminated award "may comment on any information the OMB [database] contains about the [recipient] for future consideration by Federal awarding agencies"; and

e.  "Federal awarding agencies will consider [the recipient's] comments when determining whether the [recipient] is qualified for a future Federal award." *Id.*

## FACTUAL ALLEGATIONS

### *The Public Scholars Program*

20.    The Public Scholars program has been a cornerstone of NEH's Research Programs for the past decade. Through an annual competition, the Public Scholars program awards competitive grants to support the research and writing of humanities books geared toward a broad readership. Most of the recipients are professors based at universities.

21.    The Public Scholar award is among the most prestigious in the country for humanities professors. From its very inception, the Public Scholars program carried considerable cachet—when the NEH revealed its inaugural cohort of Public Scholars, in 2015, the *New York Times* and *Washington Post* covered the announcement.[3]

---

[3] Jennifer Schuessler, *N.E.H. Announces First 'Public Scholar' Grants*, NEW YORK TIMES (July 28, 2015), https://tinyurl.com/NYTpublicscholar; Ron Charles, *Uncle Sam wants YOU to read 'popular' scholarly books*, WASHINGTON POST (July 28, 2015), https://tinyurl.com/WPpublicscholar.

22.    Becoming a Public Scholar is no mean feat. More than 90% of applicants are rejected in a typical grants cycle. Applicants find themselves vying against eminent scholars from around the country. Some applicants are Pulitzer Prize winners.[4] Others are faculty members at the nation's leading universities, such as Harvard and Stanford.[5] Amid this steep competition, winning a Public Scholar award can represent the achievement of a lifetime. The award confers status and recognition on its recipients, signaling that they are scholars of the first rank.

23.    Most Public Scholars—including Professor Porwancher—receive a $60,000 grant to support twelve months of full-time work on their respective books. The terms and conditions of the award specify that those awardees must "forgo other major activities, including teaching," during the period of performance.

24.    Per that requirement, Public Scholars who are professors must rebalance their typical duties. A professor's responsibilities usually fall into three categories: research, teaching, and service. The former entails writing books and articles in their respective fields. The latter comprises a wide array of activities such as chairing a curriculum committee, serving as an advisor to a student organization, or evaluating a junior colleague. For a professor to take up a full-time Public Scholar award, they must receive permission from their university to abstain from teaching and service so that they can wholly dedicate their energies to their NEH-funded project.

25.    Universities have strong reasons to grant such permission, despite losing the professor's labor on teaching and service. First, the Public Scholar award lends prestige not just to

---

[4] For instance, Elizabeth Fenn won the Pulitzer Prize for history in 2015 and then won a Public Scholar award in 2019. Mount Vernon, *Pandemics in American History* (2020), https://tinyurl.com/ElizabethFenn.

[5] Past NEH Public Scholars include Harvard's Robin Bernstein and Stanford's Wanda Corn. *See* Robin Bernstein, *Curriculum Vitae*, 1 (March 2025), https://tinyurl.com/RobinBernstein; National Endowment for the Humanities, *National Endowment for the Humanities Grant Awards and Offers*, 6 (August 2017), https://tinyurl.com/2017NEH.

the professor but—by association—to the university itself. Second, the award facilitates the professor's publication of a book, which promises to further enhance the institution's reputation. Third, and most importantly, the Public Scholar award bears a significant relationship to membership in the Association of American Universities (AAU).

26.    The AAU is an elite group of 71 universities distinguished by their success along certain benchmarks in research. Many universities who do not belong to the AAU aspire to receive an invitation to join. AAU benchmarks drive much activity at a university. For instance, the University of Oklahoma, which hopes to elicit an AAU invitation, oriented its strategic plan around "a University-wide commitment to faculty achievement and recognition to reach AAU peer benchmarks[.]"[6] Just as institutions that excel in research may achieve AAU membership, so too can AAU members lose their prized status. The University of Nebraska–Lincoln, for instance, was stripped of its AAU standing in 2011 for no longer reaching specific research benchmarks.[7]

27.    AAU benchmarks include faculty awards—and not just any award counts. The AAU specifies that it looks to awards expressly designated "Highly Prestigious" by the National Research Council.[8] Awards falling into the "Highly Prestigious" category include the Pulitzer Prize, the Nobel Prize, and "NEH Faculty Research Awards" such as the Public Scholar grant.[9]

28.    A professor who manages to secure a Public Scholar award is therefore a major boon to their university. If the institution is already an AAU member, the award helps the university maintain that desirable status. If the institution aspires to AAU membership, the Public

---

[6] University of Oklahoma, *Lead On University: The Next Phase,*
https://tinyurl.com/OUstrategicplan (last visited on Apr. 13, 2025).
[7] Josh Moody, *Nebraska Seeks a Return to the AAU*, INSIDE HIGHER EDUCATION (August 15, 2023), https://tinyurl.com/AAUNebraska.
[8] Association of American Universities, *Membership Policy* (April 17, 2023), https://www.aau.edu/who-we-are/membership-policy.
[9] National Research Council, *List of Highly Prestigious Awards* (November 12, 2021), https://www.aau.edu/key-issues/national-research-council-list-highly-prestigious-awards.

Scholar award offers a concrete means toward that end. Universities gladly exempt professors from teaching and service to take up Public Scholar awards because those grants confer this very palpable benefit. Conversely, if a professor secures some other award that is not marked "Highly Prestigious" for AAU purposes, then their university has far less incentive to allow the faculty member to accept that other award.

29.    Put another way, money is *not* fungible in the world of academia. A $60,000 grant from the NEH is hardly the same as a $60,000 grant from a less prestigious funding body that lacks import for the AAU. An NEH grant will undoubtedly result in the recipient receiving permission from their university to abstain from teaching and service in order to accept the award. A less prestigious grant is far less likely to result in their university approving such a reprieve.

***Professor Porwancher's Public Scholar Award***

30.    In September 2023, Professor Porwancher applied to the Public Scholars program to support his work on a book project: *The Great Jewish Lunacy Trial.*

31.    That book project tells the inspiring story of Warder Cresson, who personified the triumph of American liberty over antisemitism. The Quaker-born Cresson was appointed the United States' first diplomat to Jerusalem, in 1844. Toward the end of his four-year stay in the Holy City, he adopted the Jewish faith as his own. Cresson returned home to his native Philadelphia, only to have the local county file a charge of lunacy against him in court. The ensuing jury trial—which hinged on whether conversion to Judaism was itself evidence of insanity— became a momentous test case for religious liberty. The proceedings gripped the national imagination. If the jury deemed Cresson a lunatic, he could spend the rest of his life confined to an asylum. Instead, the jury rendered a historic verdict that gave Cresson his freedom.

32.     Professor Porwancher was motivated to pursue this specific project for several reasons. *First*, the resulting book would advance his career by fortifying his expertise on the relevance of Jewish history to American democracy. *Second*, the project celebrates America's commitment to the free exercise of faith by recovering a significant—if long forgotten—moment when religious liberty for Jews trumped the forces of antisemitism. *Third*, Professor Porwancher has long harbored concerns about the climate for Jewish people and Jewish topics in American higher education. As a professor at a major public university, Porwancher felt a special obligation to advance research on antisemitism. He was excited to write a book designed for a wide audience that would help educate the American public on the topic. He fervently believes that combatting antisemitism remains as vital in our day as it was in Cresson's own.

33.     Among the 283 Public Scholar applicants that cycle, merely 25 were awarded grants. Professor Porwancher was beyond thrilled to learn that he counted among the winners. Although he had earned other accolades throughout his career, none was so prestigious as the Public Scholar award.

34.     The anonymized experts who reviewed Professor Porwancher's grant application praised the project along several lines that correspond to the criteria adopted by the NEH. These criteria included, among other things, (1) the project's appeal to general readers, (2) the applicant's prior research record, and (3) the quality of the applicant's writing and "clarity of expression." Accordingly, one reviewer remarked on its modern-day relevance: "The work is extremely timely given the public debate and concern about antisemitism." Another highlighted the project's potential to reach a broad audience, anticipating, "This story-oriented approach should appeal to general readers and engage them in the wider topic." Yet another praised Porwancher for his "outstanding scholarly record" and "[e]ngaging writing style[.]"

35.     The NEH permitted Professor Porwancher to commence his twelve-month period of performance on the first day of a given month—as early as September 1, 2024 and as late as August 1, 2025. Although Porwancher was eager to begin full-time work on his book, he opted for his performance period to run from August 1, 2025 through July 31, 2026. He chose this timing because to have done otherwise would have been highly disruptive to his academic unit. Managing the department's course schedule is an intricate endeavor. The department must ensure, among other considerations, that it offers at the appropriate times the courses that students must take to graduate on time. For any given semester, the schedule is set two semesters in advance, and most students enroll in their courses one semester in advance. Had Professor Porwancher sought to abandon his teaching and service duties days before the fall 2024 semester began, it would have created a chaotic situation.

36.     Porwancher therefore proposed to his department head that he take leave for the 2025-2026 academic year, thus providing the department nearly a year's advance notice of his performance period for the NEH. This would afford his colleagues ample time to plan for his absence from teaching and service during the 2025–2026 academic year.

37.     To arrange for Professor Porwancher's leave, the department head reached out to the dean to make the logistical arrangements that would allow Porwancher to accept the award for the 2025–2026 academic year. The dean responded to the department head and Porwancher, writing, "First of all, congratulations, Andrew!!! . . . Above all, we want our faculty to be able to take prestigious fellowships." ASU subsequently added Porwancher's name to the website it maintains honoring NEH award recipients.[10]

---

[10] ASU, *National Endowment for the Humanities*, https://tinyurl.com/ASUNEH (last visited April 13, 2025).

**Benefits of the Public Scholar Award for Professor Porwancher**

38.     Porwancher stood to derive at least six benefits from the Public Scholar award.

39.     *First*, the award would confer significant prestige on him, a good in and of itself.

40.     *Second*, the award promised to significantly accelerate his completion of *The Great Jewish Lunacy Trial*. At the time that Professor Porwancher received his Public Scholar award, his academic unit distributed his time in the following proportions: 20% research, 20% teaching, and 60% service. With only 20% of his time dedicated to research, progress on *The Great Jewish Lunacy Trial* was slow. The Public Scholar award would let him dedicate 100% of his time to the project for a full year. Put another way, the award would allow him to accomplish in a single year what would otherwise have taken considerably longer.

41.     Publishing the book expeditiously—thanks to the award—would profit Professor Porwancher by giving him an array of financial benefits sooner: (1) a merit-based raise from his university for publishing a book, (2) a monetary advance that would accompany a book deal, (3) royalties for book copies sold, (4) honoraria for speaking engagements about the book, and (5) possibly monies from any book prizes won.

42.     *Third*, the prestige attending the Public Scholar award leads to professional opportunities for its recipients because it designates those recipients scholars of the highest caliber. Such is the esteem within the academic community for Public Scholars that when the NEH announces its annual winners, word spreads quickly who succeeded in the grant competition.

43.     For instance, Professor Porwancher received an e-mail from the head of the American Antiquarian Society (AAS)—one of the oldest and most esteemed learned societies in the country—congratulating him on the award just days after it was announced. Soon thereafter, AAS nominated Professor Porwancher for election to its membership, a major honor. AAS

members are "elected based on distinctive achievement in academic or public life."[11] Since the AAS's inception in 1812, its members have included fourteen U.S. presidents and more than seventy-five Pulitzer Prize winners. If the mere announcement of his Public Scholar award had already helped lead to this favorable development for Porwancher, then actually becoming a Public Scholar promised to bring him additional opportunities for professional distinction.

44.    *Fourth*, a book project attached to a Public Scholar award is all the more likely to attract interest from prospective publishers because the award sends a strong signal about the project's merit and appeal. Indeed, an editor from Princeton University Press—among the world's most elite academic publishers—reached out to Professor Porwancher upon hearing of his Public Scholar award to express interest in *The Great Jewish Lunacy Trial*.

45.    *Fifth*, a Public Scholar award can help a recipient garner additional research grants by signaling to other funding bodies that the scholar produces work that, under rigorous vetting, is deemed worthy of financial support. Professor Porwancher had been looking forward to citing his stature as a Public Scholar as a means toward winning other prestigious grants.

46.    *Sixth*, a Public Scholar award can help a professor parlay the grant into job opportunities at other universities. The award can facilitate career mobility in multiple ways. It serves, in and of itself, as a marker of status that is appealing to academic employers. Moreover, the award is a strong indicator that the professor is capable of winning additional awards designated "Highly Prestigious" for AAU purposes. A Public Scholar grant also facilitates the timely completion of a book, which matters because published books are the principal means by which scholars attract attention from prospective universities. And if that book were to garner favorable reviews in academic journals and/or win book prizes, the professor's job prospects

---

[11] AAS, *About the American Antiquarian Society*, https://www.americanantiquarian.org/about (last visited Apr. 13, 2025).

would improve that much more. In sum, when it comes to career mobility, the termination of a Public Scholar award wholly deprives a professor of some benefits and significantly delays others.

***Termination of Professor Porwancher's Award as Part of a Mass Termination***

47.    On January 20, 2025, Donald J. Trump was sworn in as the 47th President of the United States.

48.    According to press reports, members of the Department of Government Efficiency (DOGE) began visiting the NEH office in mid-March.[12] On April 1, NEH staffers learned that DOGE had recommended mass termination of employment for staffers and mass termination of grants for recipients.[13]

49.    On information and belief, DOGE officials were instrumental in the mass termination of grants, including Professor Porwancher's Public Scholar award.

50.    Over the coming days, the NEH initiated a campaign to place staff on leave and terminate grants *en masse*.[14] Among the more than 1,200 grantees who suddenly learned of their terminations was Professor Porwancher.[15] He received an email on April 3, 2025 signed by Defendant McDonald—and sent from the non-government email address Grant_Notifications@nehemail.onmicrosoft.com—informing him that his grant had been terminated and attaching a Notice of Termination.

51.    At no prior point had the NEH given Professor Porwancher any forewarning that it might terminate his grant. He was stunned. Not only had he been summarily robbed of the greatest

---

[12] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, NEW YORK TIMES (Apr. 1, 2025), https://tinyurl.com/HumanitiesCuts.
[13] *Id.*
[14] Jennifer Schuessler, *Trump Administration Moves to Cut Humanities Endowment*, NEW YORK TIMES (Apr. 3, 2025), https://tinyurl.com/yc5urszh.
[15] Janay Kingsberry and Anne Branigin, *At least 1,200 grants canceled as NEH cuts target humanities across U.S.*, WASHINGTON POST (Apr. 7, 2025), https://tinyurl.com/c9pfmndf.

accolade of his career, but now he faced grave uncertainty about the next academic year. His reprieve from his teaching and service responsibilities had hinged on the Public Scholar award. Without it, he faced the highly disruptive situation of needing to fulfill his teaching duties long after the course schedule had been finalized.

52.    On information and belief, the NEH did not conduct an individualized review of Public Scholar grantees.

53.    Instead, the agency summarily terminated the Public Scholar awards *en masse*, with Notices of Termination in the form of an identical notice sent to all recipients. As explained further below, the boilerplate notice gave multiple conclusory, nonsensical—and often conflicting—explanations for the termination.

54.    That Termination Notice reads in its entirety:

**NATIONAL ENDOWMENT FOR THE HUMANITIES**
**NOTICE OF GRANT TERMINATION**

April 3, 2025
Dr. Andrew Porwancher

Dear NEH Grantee,

This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. FZ29839124) effective April 3, 2025, in accordance with the termination clause in your Grant Agreement.

Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340.* For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. Any objections or appeals to this termination will be managed in strict accordance with the President's Executive Orders, including but not limited to: E.O. 14217 (Feb. 19, 2025), *Commencing the Reduction of the*

*Federal Bureaucracy*; E.O. 14151 (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing*; E.O. 14168 (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; and E.O. 14190 (Jan. 29, 2025), *Ending Radical Indoctrination in K–12 Schooling*. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 3, 2025.

Please remember that your obligations under the Grant Agreement continue to apply. Additionally, an audit may be conducted by the NEH after the termination of your grant.

Please contact Grant_Notifications@nehemail.onmicrosoft.com with only urgent questions.

Sincerely,

/s/ *Michael McDonald*
Michael McDonald
Acting Chairman, National Endowment for the Humanities
400 7th Street S.W., Washington, DC 20506

55.    As Professor Porwancher began reading the foregoing letter, he grew bewildered at the explanation for the termination. The opening line read, "This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. FZ29839124) effective April 3, 2025, in accordance with the termination clause in your Grant Agreement." However, the termination clause in the Grant Agreement had no provision for the unilateral and summary termination of the grant without cause. That clause instead reads: "**Termination**: NEH may terminate your Public Scholar award if, for any reason, you choose to discontinue the proposed program before the end of the period of performance or fail to observe the award's terms and conditions."[16] In other words, termination could only proceed

---

[16] Porwancher's official award notice from the NEH reads, "Public Scholar awards are subject to the terms and conditions contained in the General Information on NEH Public Scholar Program Awards, available on the NEH website at https://www.neh.gov/grants/manage/neh-public-scholar-program-terms-and-conditions[.]" That website in turn lays out the relevant termination provisions.

if a grantee decided to no longer pursue their NEH-funded project or if the grantee violated the award's terms and conditions. Professor Porwancher fell into neither category—he certainly did not choose to discontinue his proposed program, nor did he fail to observe the terms and conditions of a grant whose performance period had not even begun.

56.    The agency's rationale grew more pained in the second sentence: "Your grant no longer effectuates the agency's needs and priorities[.]" Professor Porwancher was perplexed. The letter offered no elaboration on what those needs and priorities were, much less did it explain how his grant failed to effectuate those needs and priorities.

57.    The same sentence also stated that "[y]our grant no longer effectuates the . . . conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340.*" But when Professor Porwancher looked up the Code of Federal Regulations cited by the letter, he learned that an awarding agency may not terminate an award for failure to comply with the award's conditions unless the agency first "determines that noncompliance cannot be remedied by imposing additional conditions," 2 C.F.R. § 200.339 (2020), and provides the recipient "an opportunity to object and provide information and documentation challenging the . . . termination action," *id.* § 200.342. Moreover, the regulations also require awarding agencies to state in a termination notice that the termination decision will be stored in an OMB database (for consideration by other agencies when deciding on future grant applications) and that grantees have an opportunity to leave clarifying comments on that information in the OMB database. *Id.* § 200.341. As noted above, NEH complied with none of these requirements: it failed to determine that Professor Porwancher's grant could not be brought back into compliance through additional conditions, it failed to provide him with an opportunity to object, and it failed to draft a Termination Notice that alerted him to the OMB database

17

procedures. In fact, the Termination Notice that Professor Porwancher received did not even *try* to explain how his grant "no longer effectuates . . . the conditions of the Grant Agreement."

58.     The third sentence was just as bewildering as the first two: "For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda." Professor Porwancher found it difficult to imagine that the key purpose of his book—fighting antisemitism—ran afoul of the President's agenda.

59.     After all, President Trump has been particularly concerned about that issue in higher education. He has consistently aimed to ensure that federal grants do not support antisemitism at universities. In the President's words during his first term, "If you want to accept the tremendous amount of federal dollars that you get every year, you must reject anti-Semitism. It's very simple."[17] More recently, during his second term, President Trump issued Executive Order 14188, which decried the "unprecedented wave of vile anti-Semitic discrimination . . . on our campuses" and mandated that it "shall be the policy of the United States to combat anti-Semitism vigorously."[18] It was no small irony that the NEH invoked the President's agenda to justify defunding a book project that itself combats antisemitism.

60.     The subsequent sentence in the Termination Notice strained credulity even further: "The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal*

---

[17] Kevin Freking, *Trump signs order targeting college anti-Semitism*, AP NEWS (December 11, 2019), https://tinyurl.com/APNewsAntisemitism. In his first term, President Trump issued Exec. Order No. 13899, 84 Fed. Reg. 68679 (Dec. 11, 2019) ("Combating Anti-Semitism"), which is discussed in the foregoing article. At the beginning of his second, he reaffirmed and expanded that Executive Order with Exec. Order 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025) ("Additional Measures to Combat Anti-Semitism").
[18] Exec. Order 14188.

*Bureaucracy*, E.O. 14217 (Feb. 19, 2025)." When Professor Porwancher looked up E.O. 14217, it made no mention of the NEH at all, much less did it mandate the agency's downsizing.

61.     Naturally, Professor Porwancher wanted to pursue any recourse to recover his grant. But the Termination Notice's commentary about the appeals process made little sense: "Any objections or appeals to this termination will be managed in strict accordance with the President's Executive Orders, including but not limited to: E.O. 14217 (Feb. 19, 2025), *Commencing the Reduction of the Federal Bureaucracy*; E.O. 14151 (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing*; E.O. 14168 (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; and E.O. 14190 (Jan. 29, 2025), *Ending Radical Indoctrination in K–12 Schooling*." Although the Notice referred Professor Porwancher to the foregoing Executive Orders, not one of those orders was even tangentially relevant to any appeals process. Indeed, the word "appeals" appears nowhere in those orders. And although the NEH does describe an appeals process for organizational recipients, the Public Scholar terms and conditions provide none at all for individual recipients.[19]

62.     The Termination Notice's very next sentence compounded Professor Porwancher's bafflement: "The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible." The Notice failed to offer any explanation of what exceptional circumstances required the agency to abandon its traditional notification process.

---

[19] *Compare* NEH, *General Terms and Conditions for Awards to Organizations* (Mar. 11, 2025), https://tinyurl.com/2nuketm2 (providing the terms and conditions for organizational grants which include an appeals process), *with* NEH, *Public Scholar Program Terms and Conditions* (Aug.13, 2024), https://tinyurl.com/yc3aea5f (providing the terms and conditions for individual public scholar grants which do not include an appeals process).

63.    Deprived of any coherent explanation for the termination or any actionable information about an appeals process, Professor Porwancher sought clarity the very next day. He used the messaging function of the NEH online portal to inquire about whether an appeals process actually existed and if so how to initiate it. Ten days later, the NEH responded that the agency "is unable to offer you a means of dispute resolution[.]"  Not only did this refusal to provide for appeal violate NEH's own regulations, but it also contravened the Termination Notice's indication that there would be an appeals process.

64.    On April 10, 2025, the *New York Times* reported that Defendants intend to redirect funds from terminated grants to another project: a proposed National Garden of American Heroes.[20]

## PLAINTIFF'S INJURIES

65.    Defendants' termination of Professor Porwancher's grant will cause him serious and irreversible harm absent injunctive relief.

66.    *First*, if Defendants disperse or otherwise spend the funds that were obligated to Professor Porwancher before he can obtain relief from this Court, they will foreclose the possibility that Professor Porwancher's grant could be reinstated even if the termination is deemed unlawful.

67.    *Second*, if the grant is not reinstated, Professor Porwancher will suffer reputational harm because he will be deprived of the prestige that the award would confer on him, a good in and of itself.

68.    *Third*, he will be robbed of a year spent immersed in full-time work on his book and thus denied its timely completion. The delay in publishing the book will considerably postpone a host of financial benefits, including (1) a merit-based raise from his university for publishing a

---

[20] Jennifer Schuessler, *Canceled Humanities Grants to Help Pay for Trump's 'Garden of Heroes'* (Apr. 10, 2025), https://tinyurl.com/NEHGarden.

book, (2) an advance that would accompany a book deal, (3) royalties for book copies sold, (4) honoraria for speaking engagements about the book, and (5) monies from any book prizes won.

69.     *Fourth*, Professor Porwancher will not enjoy an array of professional opportunities that would likely have attended his stature as a Public Scholar. His invitation to elected membership in the vaunted American Antiquarian Society—shortly after its president congratulated Porwancher on his Public Scholar award—offered an early indication of the opportunities that would present themselves. It is impossible to know what other opportunities for professional distinction Porwancher will lose out on because of his grant's termination.

70.     *Fifth*, Professor Porwancher will not have the benefit of pitching his project as a Public Scholar-funded book to prospective publishers. Although Princeton University Press did express interest, it is entirely possible that that press ultimately passes on the project and accordingly Professor Porwancher must approach alternative publishers.

71.     *Sixth*, Professor Porwancher will not be able to tout himself as a Public Scholar on the academic job market, a significant harm given that universities are keen to hire professors who can secure grants—such as Public Scholar awards—that count for AAU purposes.

72.     *Seventh*, the grant termination will further diminish his job prospects by prolonging the completion of Porwancher's book and thus delaying his ability to enter the academic job market with the published book on his curriculum vitae.

73.     *Eighth*, Professor Porwancher also has significant reliance interests in his award, which have been and continue to be severely disrupted by the termination. He opted to begin his performance period of the grant at the latest possible date precisely because an earlier start date would have unduly burdened his colleagues. They would have struggled to cover his teaching and service duties on short notice. The same logic explains why Professor Porwancher's professional

life is now in a state of disruption. He planned a leave from his service and teaching duties for the 2025–2026 academic year. Then he unexpectedly found out at a late stage that his grant is terminated. Now he must resume his usual duties after it is practicable to do so, given that course schedules are set two semesters in advance.

74.     *Ninth*, Professor Porwancher will suffer a diminished ability to successfully compete for awards from other federal agencies. To Porwancher's detriment, the NEH's termination of his grant is reported to an OMB database that other agencies must consult for five years when considering his applications.

### CLAIMS FOR RELIEF

### Count One
### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and Capricious
### (Against All Defendants)

75.     Plaintiff realleges all paragraphs above as if fully set forth here.

76.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

77.     Defendants' Termination Notice is arbitrary and capricious in multiple respects. Several examples follow.

78.     First, the Notice does not provide a reasoned explanation. An agency action is arbitrary and capricious when the agency fails to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

79.     Second, the Termination Notice fails to account for the consequences that it will produce. In this and other respects, Defendants "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

80.     Third, Defendants' funding termination fails to account for the substantial reliance interests in the award, which would have afforded Professor Porwancher the opportunity to take leave from his teaching and service obligations. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

**Count Two**
**Administrative Procedure Act–706(2)(A)**
**Contrary to Law**
**(Against All Defendants)**

81.     Plaintiff realleges all paragraphs above as if fully set forth here.

82.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

83.     The regulations that govern the administration of NEH grants set out specific conditions and procedures for terminating grants.

84.     Defendants have not followed the procedures set out in those governing regulations and have terminated Professor Porwancher's grant in circumstances under which the regulations would not allow his grant to be terminated. By doing so, Defendants have acted contrary to law.

**Count Three**
**Administrative Procedure Act–706(2)(D)**
**Action Taken Without Observance of Procedure Required By Law**
**(Against All Defendants)**

85.     Plaintiff realleges all paragraphs above as if fully set forth here

23

86.    The regulations that govern the administration of NEH grants set out specific procedures for terminating grants.

87.    Defendants have not followed those procedures in terminating Professor Porwancher's grant. In so doing, Defendants have taken action without observing the procedures required by law.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court enter the following relief:

a.    Declare unlawful and set aside Defendants' termination of Professor Porwancher's award, as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A), as not in accordance with law under 5 U.S.C. § 706(2)(A), and as taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D);

b.    Issue preliminary and permanent relief that (1) prohibits Defendants, their officers, employees, and agents from reallocating funds obligated to Professor Porwancher to other recipients, (2) requires Defendants, their officers, employees, and agents to reinstate Professor Porwancher's award, and (3) prohibits Defendants from terminating Professor Porwancher's award in the future unless they do so in a manner that complies with all applicable laws and regulations;

c.    Award Plaintiff his costs and reasonable attorney's fees as appropriate;

d.    Grant such other relief as the Court deems necessary, just, and proper.

Dated: April 17, 2025                    Respectfully submitted,

Professor Andrew Porwancher
SCETL–ASU
P.O. Box 870602
Tempe, Arizona 85287–0602
(602) 726-2110
porwancher@asu.edu

*Plaintiff*