# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Porwancher, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-01180-CJN |
| National Endowment for the Humanities, et al., | |
| *Defendants*. | |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
# MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 5

   I.   NEH Public Scholars Program .................................................................................... 5

   II.   Plaintiff's Public Scholar Award .............................................................................. 5

   III.   Mass Termination of NEH Grants, Including Plaintiff's Award ........................ 7

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT ........................................................................................................................... 10

   I.   Plaintiff Is Likely to Succeed on the Merits. ......................................................... 11

      A.   Plaintiff's APA claims are reviewable by this Court. ..................................... 11

      B.   The termination was arbitrary and capricious. ................................................. 25

      C.   The termination was contrary to law. ............................................................... 29

      D.   The termination violated the Due Process Clause. .......................................... 34

      E.   The termination violated the Spending Clause. ............................................... 37

      F.   The termination was *ultra vires*. ..................................................................... 38

   II.   Plaintiff Will Suffer Irreparable Injury Absent Preliminary Relief. .................... 40

   III.   The Balance of Equities and the Public Interest Favor Plaintiff. ........................ 43

CONCLUSION ........................................................................................................................ 44

# TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) ........................................................... 16

*AFGE v. OPM*, --- F.Supp.3d ---, 2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) ............................................. 39

*AFL-CIO v. Dep't of Lab.*, --- F.Supp.3d ---, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ........................ 39

*Albrecht v. Comm. on Emp. Benefits,* 357 F.3d 62 (D.C. Cir. 2004) ............................................... 16

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, --- F.Supp.3d ---, 2025 WL 833917 (D. Md. Mar.
   17, 2025) ...................................................................................................... 26, 27, 32

*Am. Bar Ass'n v. DOJ*, --- F.Supp.3d ---, 2025 WL 1388891 (D.D.C. May 14, 2025) ............................... 25

*Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023) ....................................... 13, 14, 15

*Am. Pub. Health Ass'n v. NIH*, 25-cv-10787 (D. Mass. May 30, 2025) ............................................... 25

*Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ................................................ 27

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ..................................................................... 43

*Beattie v. Barnhart*, 663 F. Supp. 2d 5 (D.D.C. 2009) ............................................................ 40, 42

*Biltmore Forest Broad. FM, Inc. v. U.S.*, 555 F.3d 1375 (Fed. Cir. 2009) .......................................... 13

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988) ............................................................. 33

*\*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................... 12, 18, 20, 24

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................. 44

*California v. U.S. Dep't of Educ.*, --- F.Supp.3d ---, 2025 WL 760825 (D. Mass. Mar. 10, 2025) .............. 23

*California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) ................................................... 23

*\*Cemex Inc. v. Dep't of Interior*, 560 F.Supp.3d 268 (D.D.C. 2021) ....................................... 16, 17, 18, 37

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988) ..................................... 41

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) .................................. 9, 43

*Chicago Women in Trades v. Trump*, --- F.Supp.3d ----, 2025 WL 1114466 (D.S.C. Apr. 14, 2025) .... 19, 25

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ....................................................... 34, 36

*City of El Centro v. U.S.*, 922 F.2d 816 (Fed. Cir. 1990) ........................................................... 13

*Climate United Fund v. Citibank*, --- F.Supp.3d ----, 2025 WL 1131412 (D.D.C. April 16, 2025) . 19, 25, 43

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, --- F.4th ---, 2025 WL 1393876 (9th Cir. May 14, 2025) ........ 25

*Cmty. Legal Servs. in E. Palo Alto v. HHS.*, --- F.Supp.3d ---, 2025 WL 1233674 (N.D. Cal Apr. 29, 2025)
............................................................................................................................................................ 25

*Cnty of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................ 41, 42

*Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017) .................................................... 35

*Colorado v. HHS*, --- F.Supp.3d ---, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) .............................. 27, 29, 41

*Colorado v. HHS*, 25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) ................................................ 25

*Crocker v. U.S.*, 125 F.3d 1475 (Fed. Cir. 1997) ...................................................................................... 18

*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) ........................................ 12, 18, 19, 20

*D.A.M. v. Barr*, 474 F. Supp. 3d 45 (D.C. Cir. 2020) ................................................................................ 10

*D.R. Smalley & Sons, Inc. v. U.S.*, 178 Ct. Cl. 593 (1967) ................................................................... 14, 15

*Department of Education v. California*, 605 U.S.---, 2025 WL 1008354 (Apr. 4, 2025) ..................... 23, 24

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ........................................................................ 27, 28

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .......................................................................... 28

*Esparraguera v. Dep't of Army*, 101 F.4th 28 (D.C. Cir. 2024) ....................................................... 34, 35, 36

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022) ................................................................................. 38

*Forgue v. City of Chicago*, 873 F.3d 962 (7th Cir. 2017) ............................................................................ 35

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ........................................................................ 34, 36

*Kidwell v. Dep't of Army*, 56 F.3d 279 (D.C. Cir. 1995) ............................................................................ 19

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ............................................................................... 38

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ............................................................................... 33

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............................................. 40, 44

*Maine v. USDA*, --- F.Supp.3d ---, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .................................... 24, 25

*Mass. v. Kennedy*, --- F.Supp.3d ---, 2025 WL 1371785 (D. Mass. May 12, 2025) .................................... 25

*Mass. v. NIH*, --- F.Supp.3d ---, 2025 WL 702163 (D. Mass. Mar. 5, 2025) .............................................. 40

*Me. Cmty. Health Options v. U.S.*, 590 U.S. 296 (2020) ............................................................................ 16

*Megapulse v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................................................... passim

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) .............................................................................................. 24

*Metzger, Shadyac & Schwarz v. U.S.*, 12 Cl. Ct. 602 (1987) ....................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................. 26, 28

*Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017)...................... 25

*Nat. Resources Def. Council, Inc. v. Rauch*, 244 F.Supp.3d 66 (D.D.C. 2017) ............................................ 28

*Nat'l Air Traffic Controllers Ass'n v. U.S.*, 160 F.3d 714 (Fed. Cir. 1998) .................................................. 21

*\*Nat'l Ctr. for Mfg. Sciences v. U.S.*, 114 F.3d 196 (Fed. Cir. 1997) .................................................... 21, 22

*Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ........................................................................ 38

*Nat'l Juv. Law Ctr., Inc. v. Regnery*, 738 F.2d 455 (D.C. Cir. 1984)....................................................... 35

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 22-cv-1043, 2024 WL 3443596 (D.D.C. July 15, 2024) .................................................................................................................................................... 10

*New York v. Trump*, 25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ................................................... 25

*New York v. Trump*, --- F.Supp.3d ---, 2025 WL 715621 (D.R.I. Mar. 6, 2025).................................... 27, 40

*Ohio v. EPA*, 603 U.S. 279 (2024)................................................................................................ 25, 27

*Pacito v. Trump*, 25-cv-255, 2025 WL 1077401 (W.D. Wash. Apr. 9, 2025) ............................................ 25

*Patriot, Inc. v. HUD*, 963 F. Supp. 1 (D.D.C. 1997) ................................................................................ 43

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ................................................................ 37

*Perry v. Sindermann*, 408 U.S. 593 (1972)............................................................................................. 35

*RFE/RL, Inc. v. Lake*, --- F.Supp.3d ---, 2025 WL 1232863 (D.D.C. Apr. 29, 2025)................................... 25

*Rick's Mushroom Serv., Inc. v. U.S.*, 521 F.3d 1338 (Fed. Cir. 2008) ......................................................... 13

*S. Educ. Found. v. U.S. Dep't of Educ.*, --- F.Supp.3d ---, 2025 WL 1453047 (D.D.C. May 21, 2025)....... 25

*Sam Rayburn Mun. Power Agency v. U.S.*, No. 20-1535, 2021 WL 4888872 (Fed. Cl. Oct. 19, 2021)....... 13

*San Antonio Hous. Auth. v. U.S.*, 143 Fed. Cl. 425 (2019).................................................................... 15

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................................................ 37

*\*St. Bernard Par. Gov't v. U.S.*, 134 Fed. Cl. 730 (2017) .......................................................... 13, 14, 15

*The Sustainability Institute v. Trump*, 25-cv-2152, 2025 WL 1486978 (D.S.C. Apr. 29, 2025)................. 25

*\*Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006) .............................................................. 18, 22

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992)................. 12, 16, 18

iv

*Trauma Servs. Grp. v. U.S.*, 104 F.3d 1321 (Fed. Cir. 1997) ........................................................ 12

*United States v. Mottaz*, 476 U.S. 834 (1986) ........................................................................... 19

*Widakuswara v. Lake*, --- F.Supp.3d ---, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) .................................... 25

*\*Widakuswara v. Lake*, Nos. 25-5150, 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............. passim

*\*Widakuswara v. Lake*, Nos. 25-5150, 25-5151, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ................. 17

*Woodhull Freedom Found. v. U.S.*, 72 F.4th 1286 (D.C. Cir. 2023) ................................................... 33

*Woonasquatucket River Watershed Council v. USDA*,--- F.Supp.3d ----, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................................................................................................ 17, 19, 25, 41

**STATUTES**

20 U.S.C. § 951 .......................................................................................................... 5, 44

20 U.S.C. § 956(c)(8) ...................................................................................................... 5

28 U.S.C. 1491 ............................................................................................................ 12

31 U.S.C § 6304 .......................................................................................................... 14

31 U.S.C. § 6301 ......................................................................................................... 14

31 U.S.C. § 6305 ......................................................................................................... 15

5 U.S.C. § 702 ............................................................................................................ 12

5 U.S.C. § 706 ........................................................................................................ 11, 25

**OTHER AUTHORITIES**

Appropriations Committee Democrats, *100 Days In, Trump Blocks At Least $430 Billion Dollars in Funding Owed to American People* (last visited June 1, 2025), https://tinyurl.com/3fatxkke. ............... 11

Def.-Appellant's Reply Br., *112 Genesee St., LLC v. U.S.*, No. 25-1373 (Fed. Cir. May 15, 2025), ECF No. 27 ....................................................................................................................... 22

Exec. Order 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ................................................................ 7

Exec. Order 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025) ................................................................ 9

Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025) .............................................................. 28

Merriam Webster, "Both," https://www.merriam-webster.com/dictionary/both. ........................................ 16

NEH SLT Meeting Recording - 04/03-2025,

  https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0hBcVNYY0

  xJ/o/VEMwNDc3NTI1NjEz/transcript (last visited June 1, 2025) .................................................. 8, 38, 39

NEH, *Update on the 2024 Revisions to 2 CFR 200* (June 25, 2024),

  https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200. ...................................................... 29

Opening Br. of Def.-Appellant, *112 Genesee St., LLC*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15

  .................................................................................................................................................................... 22

## RULES

2 C.F.R § 300.341 .......................................................................................................................... 20, 30, 31

2 C.F.R. § 200.0 ..................................................................................................................................... 29

2 C.F.R. § 200.339 ................................................................................................................................. 31

2 C.F.R. § 200.340 ................................................................................................................. 31, 32, 33, 34

2 C.F.R. § 200.342 ................................................................................................................................. 30

2 C.F.R. § 3374.1 ................................................................................................................................... 29

85 Fed. Reg. 49506 (Aug. 13, 2020).......................................................................................................... 32

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V................................................................................................................................ 34

U.S. Const. art. I, § 8, cl. 1....................................................................................................................... 37

U.S. Const. art. I, § 8, cl. 18..................................................................................................................... 38

**INTRODUCTION**

Thanks to a Public Scholar award from the National Endowment for the Humanities (NEH), Professor Andrew Porwancher was set to spend a year researching and drafting his book about the history of combatting antisemitism. The award promised to confer considerable prestige on Porwancher, to significantly accelerate the completion of his book, and to facilitate a host of professional benefits—that is, until Defendants illegally terminated his grant in a mass purge that summarily wiped out nearly 1500 awards.

All factors strongly favor a preliminary injunction setting aside the unlawful termination of Plaintiff's award. Because of Defendants' manifest and manifold violations of the law, Porwancher is likely to succeed on the merits. For one, the boilerplate Termination Notice sent to Porwancher was the epitome of arbitrary and capricious agency action under the Administrative Procedure Act (APA). The Notice failed to provide any individualized reasons for terminating Porwancher's grant. It offered explanations that were contrary to evidence. And it neglected to consider Porwancher's substantial reliance interests. The termination was also contrary to law, violating procedural protections required by NEH regulations and relying on impermissible post-award changes in agency priorities. Further, the termination violated Porwancher's constitutional rights under the Due Process Clause (by providing no notice or hearing) and the Spending Clause (by retroactively imposing post-award conditions on Porwancher's grant). Finally, the Termination was *ultra vires* because it was carried out by the Department of Government Efficiency (DOGE)—an agency that lacks any statutory authority whatsoever.

Absent preliminary relief, Porwancher will face numerous irreparable injuries. *First*, by losing the award itself, Porwancher will be unable to take leave from his university

to focus full-time on his research. That lost time will be unrecoverable, resulting in delayed and missed professional opportunities. He will also be denied the prestige of the award, which will harm his impending applications for highly competitive opportunities, including the Fulbright grant program (due this September 2025). *Second*, and worse still, the termination of his grant will be reported to other agencies, damaging Porwancher's reputation and negatively impacting his forthcoming Fulbright application. *Third*, the last-minute cancellation of the grant has disrupted Porwancher's carefully crafted plans for his leave from Arizona State University (ASU). Absent preliminary relief before the semester begins in August 2025, Porwancher will owe ASU two courses this fall—an obligation that will be very difficult to meet at this late stage and which will require him to give up two valuable and finite "course releases."[1] *Fourth*, the denial of Porwancher's Due Process and Spending Clause rights constitutes immediate and ongoing irreparable harm.

In contrast to the numerous harms that will befall Porwancher absent relief, a preliminary injunction would harm neither the government nor the public interest. No public interest is served by the unlawful termination of a grant that would fund research on a topic of vital import today: America's historic fight against Jew-hatred. To the contrary, such research would benefit the public at this moment of heightened antisemitism.

Defendants have little hope of prevailing on the merits. And so they will likely argue that this Court lacks jurisdiction over Porwancher's APA claims due to the Tucker Act, which vests jurisdiction over contractual disputes in the Court of Federal Claims (CFC)—a court that notably lacks power to afford the kind of equitable relief needed to

---

[1] As explained below, "course releases" function like free passes, relieving a professor of their obligation to teach a course. Porwancher only has two such releases.

remedy Porwancher's non-monetary injuries. Over the past few months, the government has consistently and *unsuccessfully* argued in a slew of grants-related cases that APA challenges to grants terminations are contractual in nature and belong in the CFC. As of this filing, courts have rejected such arguments in at least seventeen decisions since early April. *Infra* at 24-25 & n. 16. In other words, Defendants will likely seek safe harbor in the CFC not because this action is contractual—it is not—but because the CFC offers the only means to dodge claims for which there is no plausible defense.

This Court should follow its sister courts and decline any invitation to channel Porwancher's APA claims to the CFC. To begin, Porwancher's grant is not a contract within the meaning of the Tucker Act because his grant lacks the necessary "consideration" that would render it contractual: a direct benefit to the government. On that basis alone, this Court should conclude that it properly exercises jurisdiction. But even if Porwancher's grant *were* a contract, his action is not contractual because (1) his claims are grounded in federal law (*i.e.*, the Constitution, the APA, and NEH regulations), rather than the terms and conditions of the award and (2) Porwancher seeks declaratory, prospective, and equitable relief, rather than past-due money damages. Indeed, as the government itself rightly argues in a case currently pending before the Federal Circuit, plaintiffs like Porwancher are not entitled to even *seek* money damages because a naked money judgment would allow him to circumvent his grant's restrictions on how the funds may be used. And because the CFC lacks jurisdiction over such plaintiffs, the Tucker Act cannot deprive this Court of jurisdiction.[2]

---

[2] Moreover, Porwancher's *ultra vires* claim is not brought under the APA and therefore cannot be precluded by the Tucker Act.

Congress never intended the Tucker Act to serve as an escape hatch for agencies that abuse their power. Nor did Congress fashion the CFC as a whale to swallow up any and every Jonah who has wrongly suffered at the hands of an agency. The government has repeatedly argued elsewhere that grant recipients are dressing up contractual claims in equitable flair to beguile district courts into exercising jurisdiction. But the real risk in Porwancher's case is that the government dresses up his equitable claims in contractual flair to avoid answering for its violations of his rights. To be sure, some actions implicating grants may sound in contract and be justiciable in the CFC. But if any plaintiff belongs in district court, it is surely Professor Porwancher. His grant provides a direct benefit to the public—not to the government. His case turns on analysis of statute, regulation, and constitutional text—not on his grant's terms and conditions. And he seeks relief that is declaratory, prospective, and equitable—not past due money damages.

Should a plaintiff so situated as Porwancher find himself banished to the CFC, it is difficult to imagine *any* plaintiff with a terminated grant having their day in district court, no matter how meritorious their constitutional, statutory, and regulatory claims. If Defendants successfully find refuge in the CFC, the consequences will be grave: federal agencies will receive a green light to run roughshod over grantees' rights.

The D.C. Circuit explicitly warned against such an outcome in its seminal case *Megapulse v. Lewis*. There, the court rejected "an interpretation" of the Tucker Act that would allow "the government [to] avoid injunctions against activities violative of a statutory duty simply by [entering into] contract[s]," noting that "such an approach" would not only invite unlawful behavior but would also "be far from encouraging for people

otherwise willing to contract with the government." 672 F.2d 959, 971 & n.59 (D.C. Cir. 1982). This Court should do the same here.

## BACKGROUND

### I.    NEH Public Scholars Program

Congress created the NEH in 1965. In explaining the purposes of the agency, Congress declared that "the humanities belong to all the people of the United States," and recognized that "[a]n advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future." 20 U.S.C. § 951(1), (3). To that end, Congress authorized the provision of "grants . . . to . . . support the publication of scholarly works in the humanities." *Id.* § 956(c)(8). Pursuant to the statute, NEH established the Public Scholars program, an annual competition that awards grants to support the completion of nonfiction books of broad appeal to the public.

### II.    Plaintiff's Public Scholar Award

Andrew Porwancher is a Professor of History at ASU. Declaration of Andrew Porwancher ("AP Decl.") ¶ 2. He applied for a Public Scholar award to support his book project—*The Great Jewish Lunacy Trial*—which tells the inspiring story of a nineteenth-century Jewish statesman who personified the triumph of American liberty over antisemitism. *Id.* ¶¶ 14-15. In August 2024, Porwancher received thrilling news from NEH: among the 283 applicants that cycle, he stood among the 25 winners of a Public Scholar grant. *Id.* ¶ 17. Porwancher was ecstatic. *Id.* His Public Scholar award represented the greatest achievement of his career. *Id.*

Most Public Scholars—Porwancher included—receive a $60,000 grant to fund twelve months of full-time work on their respective books. *Id.* ¶ 5. The award requires its recipients to "forgo other major activities, including teaching," during the period of performance. *Id.* Given that time commitment, Porwancher had to receive permission from ASU to take leave from his teaching and service. *Id.* ¶ 6. ASU was more than happy to facilitate Porwancher's leave. *Id.* ¶ 24. After all, his award would directly benefit ASU. *Id.* ¶¶ 7-12. The Public Scholar award counts among the precious few humanities grants that help ASU maintain its coveted status as a member of the Association of American Universities, an elite group of 71 universities distinguished by their success along certain benchmarks in research. *Id.* ¶¶ 8-10. Put another way, the prestige of the award—not its stipend—incentivized ASU to approve Porwancher's leave. *Id.* ¶¶ 11-13 (explaining that Porwancher could not obtain leave simply by offering ASU $60,000).

Within days of learning about his grant, Porwancher and ASU began to assiduously arrange for his leave. *Id.* ¶¶ 21-24. He opted to have his performance period run as late as NEH would allow—August 1, 2025 through July 31, 2026—so that his department would have the maximal time to plan for his absence. *Id.* ¶ 22. Such advance planning is important because the fall course schedule is set about ten months in advance, with students signing up approximately six months in advance. *Id.* Students' steady progress toward graduation requires that departments reliably follow through on their advertised course schedules. *Id.* That progress could be upended if faculty members were to suddenly withdraw from teaching responsibilities. *Id.*

Porwancher looked forward to an array of benefits—reputational, professional, and financial—that would flow from his Public Scholar award. *Id.* ¶¶ 25-33. The grant would

confer significant prestige on him, a good in itself. *Id.* ¶ 26. It also promised to significantly accelerate his completion of *The Great Jewish Lunacy Trial*. *Id.* ¶ 27. At the time that NEH obligated Porwancher's funds, his department designated only 20% of his time for research. *Id.* The award would allow him to dedicate 100% of his time to the project for a full year. *Id.* Publishing the book expeditiously would hasten an array of opportunities and benefits, including: (1) a merit-based raise, (2) a book deal, (3) royalties (4) honoraria for book talks, (5) possibly book prizes, and (6) improved mobility on the job market. *Id.* ¶ 28.

Moreover, the prestige attending the Public Scholar award promised to facilitate yet more opportunities for professional distinction. *Id.* ¶ 29. Porwancher saw early indicators of the reputational benefits in store for him. After the announcement of his award, an eminent learned society elected Porwancher to membership, and an elite publisher expressed interest in his book project. *Id.* ¶¶ 30-31. If the mere announcement of his grant led to these favorable developments, then actually becoming a Public Scholar would surely bring Porwancher additional prospects for scholarly renown. *Id.* Moreover, Porwancher's stature as a Public Scholar stood to enhance his competitiveness for other prestigious grants, as many funding bodies consider applicants' past record of accomplishment. *Id.* ¶ 32. And, critically, the award's considerable cachet would meaningfully benefit him in the hypercompetitive academic job market. *Id.* ¶ 33.

## III.    Mass Termination of NEH Grants, Including Plaintiff's Award

On January 20, 2025, the President established DOGE as a new component of the Executive Office of the President.[3] In March 2025, two DOGE officials—Nate Cavanaugh and Justin Fox—arrived at NEH and met with senior leadership. Ex. U at 4, 10. On April

---

[3] Exec. Order 14,158, 90 Fed. Reg. 8441, 8841 (Jan. 20, 2025).

1, 2025, agency directors told NEH staff that DOGE sought to "claw back" $170 million in grants. *Id* at 10. Cavanaugh and Fox personally chose which grants to terminate and emailed nearly 1500 grantees termination notices on April 2 and 3, including the recipients of nearly all grants issued during the Biden Administration. *Id.* at 1-2, 4, 6. Cavanaugh and Fox did not process the grant terminations through NEH's grants management system. *Id.* at 10. Instead, they sent termination emails to grantees from a nongovernment Microsoft email address. Ex. L. The emails attached termination notices purportedly signed by Acting Director of NEH Michael McDonald. *Id.*; Ex. M. However, the notices were not hand-signed by McDonald or digitally signed with a verifiable digital signature. Instead, the signature was typed by someone as "/s/ Michael McDonald." Ex. M.

Following the grant terminations, NEH personnel repeatedly made clear, both in internal and external communications, that Cavanaugh and/or Fox themselves decided upon and issued the terminations. As described in greater detail below, *infra* 33-39, Acting Chair McDonald appeared to acknowledge in a staff meeting that he did not have control over the grant termination process, did not determine which grants to terminate, and did not send the termination notices.[4] Rather, as an email from an NEH employee to institutional grantees explained on April 4, 2025, "DOGE [] made the decision to terminate NEH awards . . . . At this time, NEH does not know the full scope of which awards have been terminated and who has been notified." Ex. T at 5.

Among the nearly 1500 grantees who suddenly learned of their terminations was Professor Porwancher. He received his Termination Email and Notice on April 3. AP Decl.

---

[4]    *See generally* NEH SLT Meeting Recording - 04/03-2025, https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpY N0hBcVNYY0xJ/o/VEMwNDc3NTI1NjEz/transcript (last visited June 1, 2025).

¶ 35. The Notice—which was a boilerplate letter identical to the notices sent to other Public Scholar recipients, *id.* ¶ 37—was replete with conclusory and nonsensical statements, Ex. M. Among these was an unsubstantiated claim that Porwancher's project—which addressed the history of religious liberty and the fight against Jew-hatred, AP Decl. ¶¶ 15-16—no longer effectuates the agency's priorities or President Trump's agenda, Ex. M. To take Defendants at their word, a project on American Jewish history and combatting antisemitism does not accord with either NEH priorities or the administration's agenda. Such an explanation is at odds with President Trump's recent Executive Order to adopt "Additional Measures to Combat Anti-Semitism,"[5] as well NEH's decision just one month after terminating Plaintiff's grant to fund new projects on American Jewish history.[6]

Porwancher messaged NEH the next day to inquire whether an appeals process existed and if so how to initiate it. AP Decl. ¶ 38. The agency responded that it would afford him no such process. *Id.* As explained in further detail below, Porwancher stands to suffer significant irreparable harm absent preliminary relief. *Infra* Part II.

## LEGAL STANDARD

To obtain a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

---

[5] Exec. Order 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025).
[6] On May 8, 2025, NEH announced that it would fund a museum's project examining Jewish history in Maryland, Ex. S at 2, as well as a project that aims to digitize thousands of documents regarding "the migration of Jewish people to the United States," *id.* at 3.

(citations omitted). "When the movant seeks to enjoin the government, the final two []
factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F.
Supp. 3d 45, 67 (D.C. Cir. 2020) (citation omitted).

Courts in this Circuit continue to apply a "sliding scale" approach, wherein "a
strong showing on one factor could make up for a weaker showing on another." *Nat'l R.R.
Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and
Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 22-cv-1043, 2024 WL
3443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts in this Circuit
remain bound by sliding-scale precedent notwithstanding tensions in the case law).

## ARGUMENT

All factors favor Plaintiff and this Court has jurisdiction to hear Plaintiff's claims.
Defendants violated federal law through their mass termination of NEH grants—including
Professor Porwancher's Public Scholar award. Because the termination violates his
constitutional rights, Porwancher suffers ongoing irreparable harm. Absent preliminary
relief, these harms will only compound, causing Porwancher to lose precious and
unrecoverable time working on his project, which will in turn result in a cascade of
postponed (and potentially lost) professional opportunities. And he will suffer other
irreparable harms, including reputational harms to his upcoming Fulbright grant
application and a loss of two "course releases." Conversely, there is no public interest
served by Defendants' unlawful termination of funds that have already been appropriated
and obligated. The Court should issue a preliminary injunction to preserve the *status quo
ante* until the Court is able to further consider the case.

## I.    Plaintiff Is Likely to Succeed on the Merits.

Professor Porwancher brings five claims challenging the termination of his Public Scholar award as part of a mass termination of NEH awards. The first four claims make clear that the termination violated the APA, 5 U.S.C. § 706(2)(A),(B) because it was (1) arbitrary and capricious, (2) contrary to law, (3) violated the Due Process Clause, and (4) violated the Spending Clause. The fifth claim demonstrates that the termination was *ultra vires*. As an initial matter, Porwancher's APA claims are reviewable by this Court. Moreover, Plaintiff is likely to prevail on all five claims.

### A.  Plaintiff's APA claims are reviewable by this Court.[7]

The Trump Administration—on a scale unknown in the annals of this republic—has terminated grants *en masse* across the executive branch in recent months.[8] Amid the flood of ensuing litigation, the government has sought to evade accountability for flagrant violations of the law by trying to use the Tucker Act as a statutory eject-button that launches plaintiffs from district courts into the CFC. As explained below, those attempts have largely been unsuccessful. *Infra* at 24-25 & n. 16 (collecting cases). Any attempt to reprise that argument in this case will be wholly unavailing: the Tucker Act simply does not provide for review of Porwancher's grant (which is not a money-mandating contract), nor his APA claims (which are not contractual in nature).

The Tucker Act question originates from two provisions that delineate the scope of actions reviewable under that act and the APA. Specifically, section 702 of the APA

---

[7] As noted above, Porwancher's *ultra vires* claim is not brought under the APA and so is not precluded from this Court's jurisdiction by the Tucker Act.

[8] Appropriations Committee Democrats, *100 Days In, Trump Blocks At Least $430 Billion Dollars in Funding Owed to American People* (last visited June 1, 2025), https://tinyurl.com/3fatxkke.

provides that review under that statute is unavailable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. And section 1491(a) of the Tucker Act provides that the CFC "shall have jurisdiction to render judgment upon any claim . . . founded" on "any express or implied contract with the United States." 28 U.S.C. 1491(a). Reading these provisions together, the D.C. Circuit has "interpreted the Tucker Act to . . . 'impliedly forbid[]'" the bringing of contract actions under the APA "in district court." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citations omitted).[9]

To determine whether a case is such a contract action, a reviewing court must first inquire whether any contract exists within the meaning of the Tucker Act. *Trauma Servs. Grp. v. U.S.*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction in the [CFC], [the plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). But even if there is a contract, a court must then ask whether the action at issue is fundamentally contractual. Mere reference to a contract is insufficient to reach the CFC— the *action* in question must be contractual in nature. *Megapulse*, 672 F.2d at 967-68 (rejecting the notion that "*any* case requiring *some* reference to or incorporation of a contract is necessarily *on the contract* and therefore directly within the Tucker Act.")

---

[9] There is reason to doubt this precedent because, as the Supreme Court has pointed out, no "language in the Tucker Act" makes the CFC's jurisdiction over contract claims "exclusive." *See Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988). Thus, the D.C. Circuit itself has recognized that there is a "strong case" that, in fact, "the Tucker Act should not be read to 'impliedly forbid'" district courts from considering "contract actions for specific relief." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 612 (D.C. Cir. 1992), *abrogated in part on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Porwancher reserves the right to seek reconsideration of this precedent in an appropriate forum.

(emphasis in original). All steps in this analysis make clear that Porwancher's APA claims are reviewable by this Court.

### 1. The CFC lacks jurisdiction because Plaintiff's grant is not a contract within the meaning of the Tucker Act.

The government will likely protest that Porwancher's grant is a contract. Not so. Porwancher's grant lacks a critical element to contract formation: consideration.

It is well-settled law that creating a contract with the United States requires four elements: 1) "mutuality of intent," 2) "consideration," 3) "offer and acceptance," and 4) "authority on the part of" a government official "to bind the United States." *Biltmore Forest Broad. FM, Inc. v. U.S.*, 555 F.3d 1375, 1380 (Fed. Cir. 2009). "In the context of government contracts . . . consideration must render a benefit to the government, and not merely a detriment to the contractor." *St. Bernard Par. Gov't v. U.S.*, 134 Fed. Cl. 730, 735 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019) (quoting *Metzger, Shadyac & Schwarz v. U.S.*, 12 Cl. Ct. 602, 605 (1987)). *See also Sam Rayburn Mun. Power Agency v. U.S.*, No. 20-1535, 2021 WL 4888872, at *18 (Fed. Cl. Oct. 19, 2021) (agreements with the government "lack . . . consideration" where "the government [does] not receive a direct benefit") (citing *Rick's Mushroom Serv., Inc. v. U.S.*, 521 F.3d 1338, 1343-44 (Fed. Cir. 2008)); *City of El Centro v. U.S.*, 922 F.2d 816, 822-23 (Fed. Cir. 1990) (hospital did not have a contract where the government did not receive a benefit).

Citing the CFC, a court in this district has explained in *American Near East Refugee Aid v. USAID* that the benefit must be "'tangible' and 'direct,' rather than 'generalized.'" 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (quoting *St. Bernard*, 134 Fed. Cl. at 736). Merely advancing U.S. "policy interests" or providing a "generalized benefit" for the public does not qualify; the benefit must be more direct, such as a "financial benefit." *Id.* at 134. *See*

*also D.R. Smalley & Sons, Inc. v. U.S.*, 178 Ct. Cl. 593, 597-98 (1967), *cert. denied*, 389 U.S. 835 (1967) (grants of highway funds did not create contractual liability for the federal government because the grants were "gifts or gratuities").

The *American Near East Refugee Aid* court further warned that if courts construe consideration too broadly to include "amorphous" benefits—such as "the advancement of U.S. foreign policy interests"—"then every cooperative agreement [or grant] would transform into a contract." 703 F. Supp. 3d at 134. Such a result would undermine federal law, which "clearly envisions different functions" for contracts, cooperative agreements, and grants. *Id.* Indeed, Congress has distinguished between the legal instruments in the Federal Grant and Cooperative Agreements Act (Grant Act), which provides a "clear definition of the relationships" each instrument "reflect[s]" "between executive agencies and . . . recipients." 31 U.S.C. § 6301. Critically, the "principal purpose" of grants—unlike contracts—"is to transfer a thing of value to the . . . recipient to carry out a public purpose . . . authorized by [] law . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." *Id.* § 6304(1).

Applying these principles, the CFC has held that agreements are "not [] enforceable contract[s] in this Court" where the government does "not receive a direct benefit." *See, e.g.*, *St. Bernard*, 134 Fed. Cl. at 735. For example, a cooperative agreement was not an enforceable contract where the U.S. government funded a local government's watershed protection measures and received only "a generalized benefit" to the government in the form of "reduce[d] damage from future flooding." *Id.* at 735-36. Indeed, "the entire purpose of a cooperative agreement [or grant] is to transfer a thing of value *to* the local government *from* the executive agency." *Id.* (emphasis in original) (quoting the Grant Act at 31 U.S.C.

§ 6305). Notably, in such cases the government itself insists that such awards are beyond the CFC. *See, e.g., id.* at 734-35.[10]

So too here. Porwancher's award exclusively supports the writing of his book. Any suggestion that the book directly benefits the government would be, frankly, hard to credit. After all, NEH *itself* acknowledges that the award is intended to support books that are "written for the *broad public*." Ex. D at 1 (emphasis added). And mere weeks ago, NEH reiterated that "NEH-supported projects . . . support public purposes," Ex. R at 4—affirming the award's unequivocal "public purpose" and "generalized" benefit. *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (citing the Grant Act). In sum, Porwancher cannot have contractual claims *against* Defendants because he never had a contract *with* Defendants. On that basis alone, this Court need take its Tucker Act inquiry no further.

### 2. Plaintiff's action is not contractual "in essence."

Even if Porwancher's grant was somehow deemed a contract—which it is not—his *action* here is not contractual. "[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968. To determine whether an action is contractual, courts make a two-pronged inquiry: whether "a particular action . . . is or is not 'at its essence' a

---

[10] Consistent with this analysis, the CFC has occasionally held that certain grants were contracts where the grants provided a direct benefit to the government. In *San Antonio Housing Authority v. United States*, the CFC explained that grant agreements can "encompass both contracts . . . and arrangements that are not contracts," 143 Fed. Cl. 425, 461 (2019) (quotation omitted), such as the "grant of highway funds" at issue in *D.R. Smalley, id.* at 462 (citing 178 Ct. Cl. at 598). As noted below, Porwancher's grant lacks consideration because it provides no direct benefit to the government.

contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought[.]" *Id.*[11]

**a.** As for the first prong, courts ask whether the claims "turn[] *entirely* on the terms of a contract." *Cemex Inc. v. Dep't of Interior*, 560 F.Supp.3d 268, 276 (D.D.C. 2021) (Nichols, J.) (quoting *Albrecht v. Comm. on Emp. Benefits,* 357 F.3d 62, 69 (D.C. Cir. 2004)). "[W]hen claims stem from something more than just a contract, say the Constitution or the APA, then the litigant may bring the claims in 'federal district court even when the claims depend on the existence and terms of a contract with the government.'" *Id.* (quoting *Transohio*, 967 F.2d at 610).

These principles were recently applied in two grants termination cases (similar to Porwancher's) before the D.C. Circuit. In *Widakuswara v. Lake*, a divided motions panel stayed injunctions issued by Judge Lambert in part based on the government's Tucker Act arguments, with a dissenting opinion issued by Judge Pillard. Panel Decision, Nos. 25-5150, 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025). The panel's stay order was

---

[11] The courts have not clarified whether these two prongs are conjunctive or disjunctive. That issue is immaterial here because Porwancher satisfies both prongs for district court jurisdiction. *See infra* at 16-22. Still, this Court should treat the test as conjunctive—*i.e.*, both prongs need to be met for the action to be contractual—for two reasons. *First*, the *Megapulse* test states that whether the action is contractual depends "*both* on the source of the rights . . . and . . . the type of relief sought," suggesting a conjunctive test. 672 F.2d at 968 (emphasis added). As used here, the word "both" functions as a conjunction "to indicate and stress the inclusion of each of two or more things[.]" Merriam Webster, "Both," https://www.merriam-webster.com/dictionary/both. *Second*, this interpretation is consistent with the Supreme Court's admonition that the APA's "generous review provisions must be given a hospitable interpretation." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140-41 (1967) (quotes omitted)*.* As *Megapulse* emphasized, courts should not construe what constitutes a contract action "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." 672 F. 2d at 968. *See also Me. Cmty. Health Options v. U.S.*, 590 U.S. 296, 323-34 (2020) ("The Tucker Act yields when . . . the [APA] provides an avenue for relief." (citation omitted)).

subsequently reheard and vacated by the *en banc* D.C. Circuit. *Widakuswara v. Lake* (*En Banc* Decision), Nos. 25-5150, 25-5151, 2025 WL 1521355 at *1 (D.C. Cir. May 28, 2025).[12] The *en banc* court found that "the government ha[d] not made the requisite strong showing of a likelihood of success" on its Tucker Act arguments, "substantially for the reasons explained by Judge Pillard['s]" dissent. *Id.* at *1 (citation omitted). And as Judge Pillard in turn explained, "[w]hat matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." 2025 WL 1288817 at *12.

That reasoning applies here: Porwancher's rights and claims flow from the Constitution, the APA, and NEH regulations. Such claims do not "turn *entirely* on the terms of the contract" and so are properly before this Court. *Cemex*, 560 F.Supp.3d at 276. In fact, Counts I, II, and IV of Porwancher's First Amended Complaint (FAC) do not require any reference whatsoever to the terms and conditions of the award.[13] *See e.g.*, *Woonasquatucket River Watershed Council v. USDA*,--- F.Supp.3d ----, 2025 WL 1116157 at *13 & n.5 (D.R.I. Apr. 15, 2025) (pending appeal under No. 25-1428) (rights did not

---

[12] Note, the Panel and *En Banc* Decisions both addressed four cases in total. The *En Banc* decision vacated the Panel Decision with respect to two cases (25-5150 and 25-5151) but denied rehearing with respect to the other two (25-5144 and 25-5145). The *En Banc* Decision explained that one of those cases (25-5145) did not involve grants or the Tucker Act, but instead concerned other issues that the *en banc* court had not voted to rehear. *Id.* at *1. As for the fourth case (25-5144), the *en banc* court explained that to the extent the plaintiffs-appellants were injured by grants terminations, those injuries were caused by the same terminations at issue in 25-5151. *Id.* at *2. Thus, the injuries were redressed by the *en banc* court's vacatur of the Panel Decision as to 25-5151. *Id.*

[13] Count I alleges that the Termination Notice was arbitrary and capricious. FAC ¶¶ 79-85. Count II argues that the Notice violated NEH regulations, *id.* at 86-89, which are not referenced in the terms and conditions of Porwancher's award, Ex. E at 1; Ex. B at 24. And Count IV contends that the Notice violated the Spending Clause. FAC ¶¶ 94-97.

stem from grants where "federal statutes and regulations largely control[led] the analysis" of claims and neither party "pointed the Court to specific terms and conditions in the grant[s]"). Further, Count III is a Due Process claim, over which "this Court has jurisdiction," while "the [CFC] ordinarily lacks jurisdiction." *Cemex*, 560 F. Supp. 3d at 275-76 (citing *Crocker v. U.S.*, 125 F.3d 1475, 1476 (Fed. Cir. 1997)). Accordingly, the Due Process claim unequivocally belongs before this Court, as the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the [CFC]." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). *See also Transohio,* 967 F.2d at 611 (Tucker Act does not strip district courts of jurisdiction over Due Process claims).

Stepping back, the heart of this dispute is not whether the parties to a single contract violated its terms. Rather, the issue is whether Defendants—when terminating Porwancher's grant as part of a mass purge—violated Porwancher's Constitutional rights, various procedural protections required by NEH regulation, and their APA obligations to engage in reasoned decision-making. "These are not questions the district court can answer by examining a contractual promise made by [NEH] to [Porwancher]." *Crowley*, 38 F.4th at 1109 "It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of [federal law] to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908.

**b.** With respect to the second prong regarding the relief sought, the D.C. Circuit has held that "the crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107. Further, the answer to that question is *no* "as long as the complaint only requests non-monetary relief that has

considerable value independent of any future potential for monetary relief and as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery." *Id.* at 1107-08 (cleaned up); *see also United States v. Mottaz*, 476 U.S. 834, 851 (1986) ("the essence of a Tucker Act claim for monetary relief" is one requesting "damages for the Government's past acts").

Porwancher has explicitly stated in his complaint that he does not seek money damages. FAC ¶ 10. Instead, he seeks declaratory relief (*i.e.*, that the termination violated the Constitution, the APA, and NEH regulations) and prospective equitable relief (*i.e.*, vacatur of the Termination Notice and reinstatement of his grant). FAC at 27 (prayer for relief).[14] As explained at length in his declaration, such relief "has considerable value independent of"—and is "not negligible in comparison with"—"the potential monetary recovery" that might accompany vacatur of the Termination Notice. *Crowley*, 38 F.4th at 1107-08. Among other things, vacatur would provide the following benefits:

o (1) Porwancher's award would be reinstated, conferring considerable prestige on Porwancher, a good in and of itself. AP Decl. ¶¶ 7, 9-10, 26; *cf. Kidwell v. Dep't of Army*, 56 F.3d 279, 285 (D.C. Cir. 1995) (claims did not belong in the CFC where requested relief offered "direct non-monetary benefit to the plaintiff because [it] . . . would lift some of the shame associated with failing to receive an honorable discharge");

---

[14] Judge Pillard's dissent in the *Widakuswara* Panel Decision—whose reasoning was "substantially" adopted by the *en banc* D.C. Circuit, *supra* at 17—found that the claims of plaintiffs requesting such relief "do not belong in the Court of Claims." 2025 WL 1288817 at *13. Numerous district courts have come to the same conclusion. *See, e.g.*, *Woonasquatucket*, 2025 WL 1116157 at *13-14; *Chicago Women in Trades v. Trump*, --- F.Supp.3d ----, 2025 WL 1114466 at *9 (D.S.C. Apr. 14, 2025); *Climate United Fund v. Citibank*, --- F.Supp.3d ----, 2025 WL 1131412 at *10 (D.D.C. April 16, 2025).

o  (2) The award's prestige would generate other downstream benefits, such as increased professional, publishing, and job opportunities. AP Decl. ¶¶ 29-33;

o  (3) Reinstatement of the grant would allow Porwancher to take leave from his university in order to focus full-time on his book, which he would not otherwise be able to do. *Id.* ¶¶ 5-13, 27 (explaining that it is the award's prestige—not its stipend—that allows Porwancher to obtain leave);

o  (4) By accelerating his book's completion, reinstatement of the award would allow Porwancher to benefit from the opportunities created by a completed book—such as speaking engagements and improved career mobility—much more quickly than he would otherwise. *Id.* ¶ 28;

o  (5) Vacatur would mitigate the negative impact that the termination will otherwise have on Porwancher's ability to win future federal awards. Terminations for noncompliance are reported to other agencies for consideration when judging a recipient's qualifications for future awards. *See* 2 C.F.R § 300.341. Although Porwancher has not, in fact, failed to comply with his award conditions—indeed, his performance period has not yet begun—his Termination Notice claimed that he has. Ex. M. Vacatur would redress this unfair harm.

Likewise, the requested declaratory relief is also valuable. A ruling that Defendants have violated NEH regulations will clarify the circumstances under which Defendants may terminate this grant and any future grants that Porwancher may be awarded. *See infra* at 31-34; *Bowen*, 487 U.S. at 889-90 (declaratory relief is valuable because it "affect[s] the future relationship between the parties" by clarifying their legal obligations). Thus, the "equitable relief sought by [Porwancher] has significant value," *Crowley*, 38 F.4th at 1111, and Porwancher's case cannot plausibly be construed as a "disguised claim for monetary relief," *id.* at 1113 (quoting *Megapulse*, 672 F.2d at 971).

Conversely, the CFC "has no power to grant equitable relief," *Bowen*, 487 U.S. at 905, and so would not be able to provide Porwancher with adequate relief, as his injuries

are fundamentally not financial. *See infra* Part II (listing non-financial injuries). For example, obtaining $60,000 in money damages through CFC litigation would not enable Porwancher to obtain leave from his university to work on his book.[15] This only "underscores why it is not the appropriate court." *Widakuswara* Panel Decision, 2025 WL 1288817 at *13 (Pillard J., dissenting); *supra* at 17 (*en banc* court rejected government's Tucker Act arguments "substantially for the reasons explained by Judge Pillard").

Not only would money damages fail to redress Porwancher's injuries; he is not even entitled to *seek* money damages under Federal Circuit case law. Because the prospective use of his grant funds is subject to "restrictions governing the manner in which [the] money may be . . . spent," Porwancher is "not [] entitled to a monetary judgment," as that remedy "would allow [Porwancher] to use the funds . . . for any purpose, without restriction." *Nat'l Ctr. for Mfg. Sciences (NCMS) v. U.S.*, 114 F.3d 196, 201 (Fed. Cir. 1997). And where money damages are off the table, so too is CFC jurisdiction. *Nat'l Air Traffic Controllers Ass'n v. U.S.*, 160 F.3d 714, 716 (Fed. Cir. 1998) ("a plaintiff seeking to invoke the court's jurisdiction [under the Tucker Act] must present a claim for actual, presently due money damages from the United States" (citation omitted)). For that reason, the Federal Circuit has held that the Tucker Act does not "divest the district court of the authority to conduct

---

[15] For most professors—including Porwancher—the grant's $60,000 stipend does not cover their full salaries. AP Decl. ¶ 12. Taking leave from their universities (and losing their salaries) to accept the NEH grant would therefore require professors to take a financial hit. To incentivize professors to nevertheless apply for NEH grants, ASU offers a "top up" wherein the university agrees to pay an NEH recipient the difference between the value of the grant and the professor's salary during the academic year. *Id.* In other words, ASU will make a double sacrifice in allowing Porwancher to take leave: the university loses his teaching and service, while still paying out much of his salary. *Id.* ASU agrees to this arrangement only because of the prestige of the grant itself. *Id.* Thus, even if Porwancher were to offer ASU *more* than $60,000—say $70,000—from his bank account in exchange for a year's leave, ASU would surely decline. *Id.* ¶ 13.

APA review" over claims brought by plaintiffs who have been deprived of funds subject to future restrictions. *NCMS*, 114 F.3d 196 at 202.

That reasoning applies here: Porwancher's grant restricts his use of the funds, requiring that he use the funds to "work full-time" on his book and that he "forego other major activities, including teaching." Ex. D at 4-5; AP Decl. ¶ 5. Thus, Porwancher "would not be entitled to a monetary judgment" from the CFC—and therefore he lacks a right of action in the CFC—even if he so desired to litigate in that forum. *NCMS*, 114 F.3d at 201.

Consistent with the *NCMS* holding, the government currently argues in a brief pending before the Federal Circuit that the CFC lacks jurisdiction over claims brought by plaintiffs like Porwancher. As the government persuasively explains in that case, plaintiffs seeking funds subject to "restrictions" are "precluded . . . from receiving a 'naked money judgment' within the competency of the [CFC]." Def.-Appellant's Reply Br., *112 Genesee St., LLC v. U.S.*, No. 25-1373, at 15 (Fed. Cir. May 15, 2025), ECF No. 27. Such plaintiffs thus do not have "rights of action . . . over which the [CFC] could exercise jurisdiction." *Id.* at 14; *see also* Opening Br. of Def.-Appellant, *112 Genesee St., LLC*, No. 25-1373, at 31–33 (Fed. Cir. Mar. 14, 2025), ECF No. 15 (similar); *id.* at 37 (arguing that plaintiffs who lack a right to money damages "cannot . . . avoid district court jurisdiction"). In other words, the government's current position in ongoing litigation is that the CFC would not have jurisdiction over any attempt by Porwancher to recover the $60,000 awarded by his grant. And as the D.C. Circuit has made clear, a district court cannot "be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the [CFC]." *Tootle*, 446 F.3d at 176. This court should adopt the government's reasoning in *112 Genesee* and find that Porwancher's case *must* be before this court because it *cannot* be before the CFC.

### 3. The Education v. California stay order is not the contrary.

In other ongoing litigation, the government has repeatedly—and unsuccessfully, *infra* at 24-25 & n. 16—pointed to the Supreme Court's recent stay order in *Department of Education v. California*, 605 U.S.---, 2025 WL 1008354 (Apr. 4, 2025), as grounds for channeling grants cases from district court into the CFC. In *California*, the Supreme Court stayed a district court's order that "require[d] the Government to pay out past-due grant obligations." *Id.* at *1. The Court reasoned that the APA's waiver of sovereign immunity "does not extend to orders to enforce a contractual obligation to pay money. . . . Instead, the Tucker Act grants the [CFC] jurisdiction over suits based on any express or implied contract with the United States." *Id.* (quotations and citations omitted). For five reasons, this Court should not infer from the order that it lacks jurisdiction.

*First*, Porwancher's grant is not a contract for Tucker Act purposes. *Supra* Part I(A)(1). This fact-intensive jurisdictional inquiry was not addressed by any of the reviewing courts in *California*. *See generally California*, 2025 WL 1008354; *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025); *California v. U.S. Dep't of Educ.*, --- F.Supp.3d ---, 2025 WL 760825 at *1 (D. Mass. Mar. 10, 2025).

*Second*, the *California* stay order was primarily based on the fact that the district court included an order to "pay out *past-due* grant obligations," which the Court reasoned was akin to an "order[] 'to enforce a contractual obligation to pay money.'" 2025 WL 1008354 at *1 (emphasis added). Unlike in *California*, Porwancher does not ask for "past-due" sums. Rather, Porwancher seeks equitable relief that is exclusively *prospective* (since his performance period has yet to even begin).

*Third*, the stay order affirmed that the Supreme Court's decision in *Bowen* remains good law: "[A] district court's jurisdiction 'is not barred by the possibility' that an order

setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U. S. at 910). As already explained, Porwancher seeks the type of equitable relief that the stay order makes clear is permissible, including an order that would "set[] aside an agency's action." *Id.* Thus, this Court's "jurisdiction is not barred by the possibility that" vacatur of the Termination Notice "may result in the disbursement of funds." *Id*.

*Third*, the Supreme Court also emphasized that the plaintiffs in *California* had "the financial wherewithal to keep their programs running," and therefore were not likely to suffer irreparable harm. *Id.* That rationale is wholly inapplicable here, where Porwancher requires the grant itself to pursue his book project full-time this coming year and will suffer irreparable harms absent relief. *Infra* Part II.

*Fourth*, the stay order is of limited utility to this Court. "[T]he Supreme Court issued this decision on its emergency docket, without full briefing or hearing." *Maine v. USDA*, --- F.Supp.3d ---, 2025 WL 1088946 at *19 n. 8 (D. Me. Apr. 11, 2025) (rejecting government's reliance on *California* stay order). As several justices have remarked, decisions on the "shadow docket" are not "decisions on the merits," which are decided only "after full briefing, oral argument, and our usual extensive internal deliberations." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring); *accord id.* at 883 (Kagan, J., dissenting) (critiquing emergency orders for necessitating decisions without "full briefing and argument" and based on "scanty review").

Based on the above reasoning, in the nearly two months that have transpired since the *California* stay order, courts across the country have issued at least seventeen opinions in grants-termination cases rejecting the government's Tucker Act arguments and finding the *California* stay order inapposite—including the *en banc* D.C. Circuit's "substantial[]"

endorsement of Judge Pillard's *Widakuswara* opinion, *supra* at 17, a decision by the Ninth Circuit, and five decisions from courts in this district.[16] This Court should likewise decline to treat the Supreme Court's order as controlling here.

### B.  The termination was arbitrary and capricious.

Turning to the merits, Porwancher is likely to succeed in showing that the termination of his grant—which was cancelled as part of a mass termination—is the epitome of arbitrary and capricious agency action.

The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). "An agency action qualifies as arbitrary or capricious if it is not reasonable *and* reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quotation omitted); *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between "substantive unreasonableness claims" and "lack-of-reasoned-explanation claims"). The latter requires that an "agency must examine

---

[16] Note, decisions that are preceded by an asterisk are currently subject to a pending petition for rehearing *en banc* or a pending appeal. \**Cmty. Legal Servs. in E. Palo Alto v. HHS*, --- F.4th ---, 2025 WL 1393876 at \*2-4 (9th Cir. May 14, 2025); \**Pacito v. Trump*, 25-cv-255, 2025 WL 1077401 at \*3 (W.D. Wash. Apr. 9, 2025); *Maine v. USDA.*, 2025 WL 1088946 at \*18-19 & n.8; \**New York v. Trump (New York II)*, 25-cv-39, 2025 WL 1098966 at \*1-3 (D.R.I. Apr. 14, 2025); *Chicago Women in Trades*, 2025 WL 1114466 at \*8-10; \**Woonasquatucket*, 2025 WL 1116157 at \*12-15; \**Climate United Fund*, 2025 WL 1131412 at \*9-12; \**Widakuswara v. Lake*, --- F.Supp.3d ---, 2025 WL 1166400 at \*9-10 (D.D.C. Apr. 22, 2025); \**The Sustainability Institute v. Trump*,  25-cv-2152, 2025 WL 1486978 at \*1-6 (D.S.C. Apr. 29, 2025); \**RFE/RL, Inc. v. Lake*, --- F.Supp.3d ---, 2025 WL 1232863, at \*4-5 (D.D.C. Apr. 29, 2025); \**Cmty. Legal Servs. in E. Palo Alto v. HHS.*, --- F.Supp.3d ---, 2025 WL 1233674 at \*6-7 (N.D. Cal Apr. 29, 2025); *Mass. v. Kennedy*, --- F.Supp.3d ---, 2025 WL 1371785 at \*3-9 (D. Mass. May 12, 2025); *Colorado v. HHS (Colorado II)*, 25-cv-00121, 2025 WL 1426226 at \*6-9 (D.R.I. May 16, 2025); *Am. Bar Ass'n v. DOJ*, 2025 WL 1388891 at \*4-6 (D.D.C. May 14, 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, --- F.Supp.3d ---, 2025 WL 1453047 at \*5-9 (D.D.C. May 21, 2025); Memo. and Order, *Am. Pub. Health Ass'n v. NIH*, 25-cv-10787, at 14-15 (D. Mass. May 30, 2025), ECF No. 84.

the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An explanation is inadequate when the agency "entirely failed to consider an important aspect of the problem" or offered an explanation "that runs counter to the evidence before the agency." *Id.* Defendants have violated this standard in four ways:

*First*, the decision to terminate Porwancher's grant was substantively unreasonable because it was part of a mass termination that did not involve an individualized review. In fact, the Termination Notice sent to Professor Porwancher was identical to the notices received by other Public Scholars; not one of these letters provided explanations specific to any of the scholars' projects. AP Decl. ¶ 37. As one district court has explained, the "use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information." *Am. Ass'n of Colleges for Teacher Educ. v. McMahon ("AACTE")*, --- F.Supp.3d ---, 2025 WL 833917 at *21 (D. Md. Mar. 17, 2025).

Consistent with its boilerplate nature, the Notice's purported rationales for termination are not applicable to Porwancher's grant and are therefore substantively unreasonable. For example, it claims that Porwancher's project "no longer effectuates the agency's needs and priorities," nor "further[s] . . . the President's agenda." Ex. M. But Porwancher's project is on American Jewish history and combatting antisemitism—topics that appear to accord with agency priorities *and* President Trump's agenda. Just one month after cancelling Porwancher's grant, NEH announced that it would fund two projects on American Jewish history. *Supra* at 9 & n.6. Likewise, the President recently issued an

Executive Order adopting "Additional Measures to Combat Anti-Semitism."[17] Moreover, the Notice's claim that Porwancher's project is out of compliance with the "conditions of the Grant Agreement," Ex. M, cannot be true as his period of performance has not even begun, Ex. E at 1. The termination was therefore "substantively unreasonable in violation of the APA." *New York v. Trump (New York I)*, --- F.Supp.3d ---, 2025 WL 715621 at *12 (D.R.I. Mar. 6, 2025) (pending appeal under No. 25-1236) (quotation omitted); *Colorado v. HHS (Colorado I)*, --- F.Supp.3d ---, 2025 WL 1017775 at *3 (D.R.I. Apr. 5, 2025) ("mass termination of funding was likely not substantively reasonable").

*Second*, the boilerplate Notice fell far short of the reasoned explanation required by the law. *See Ohio v. EPA*, 603 U.S. at 292 (agency action must be both reasonable "and reasonably explained"). In claiming that Porwancher's project "no longer effectuates the agency's needs and priorities," Ex. M, the Notice did not identify what those "needs and priorities" were, *id.* Nor did the Notice explain the ways in which Porwancher's project fails to effectuate those priorities. Such a "conclusory statement[] will not do; an agency's statement must be one of *reasoning.*" *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (quotation omitted); *AACTE*, 2025 WL 833917, at *21 (grant terminations were unreasoned because the agency's explanations "omit[ed] any specificity about the reason that the Department found any individual grant 'inconsistent with . . . Department priorities.'").[18]

---

[17] Exec. Order 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025).

[18] NEH's subsequent April 24 announcement—that NEH "cancelled awards that are at variance with" the agency's new priorities, Ex. R at 5—does not cure the Termination Notice's flaws. To begin, "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quotation omitted). Moreover, like the Termination Notice itself, the April

For the same reasons, the Termination Notice was unreasoned because it did not explain its statement that Porwancher's "grant no longer effectuates the . . . conditions of the Grant Agreement." Ex. M. Just as the Notice failed to identify or explain how the grant no longer aligns with its priorities and needs, so too did it fail to identify the specific "conditions" at issue or how the grant no longer complies with them.

*Third*, the Notice's explanation was contrary to the evidence. The Notice explained that the "President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions." Ex. M (citing *Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025)). But that Executive Order does not even mention the NEH, let alone mandate that the agency shrink itself.[19] "Suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong." *Nat. Resources Def. Council, Inc. v. Rauch*, 244 F.Supp.3d 66, 96 (D.D.C. 2017) (citing *State Farm*, 463 U.S. at 43).

*Fourth*, the Notice changed course without considering Porwancher's reliance interests and without providing a reasoned explanation for that changed course. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. at 30 (quotation and citations omitted)). And it must also "provide a reasoned explanation for the change," including "for disregarding facts . . . that underlay . . . the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). But the Termination Notice did neither. The Notice failed to consider that this late-

---

24 announcement includes only a conclusory statement without any explanation regarding why Porwancher's project does not comport with the new priorities. Ex. R. at 5.
[19] *See generally* Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19 2025).

stage termination would disrupt the careful plans that Porwancher made in reliance on the award, AP Dec. ¶¶ 21-24, causing him significant injuries, *infra* at 41-42. Nor did the Notice acknowledge—let alone explain its departure from—the factual findings that NEH made when first bestowing the award on Porwancher. *Compare* Ex. C (NEH evaluations of Porwancher's proposal making findings about the strength of the project), *with* Ex. M (omitting any mention of prior findings). Because the "termination notice[] . . . failed to provide a reasoned explanation for the sudden change in its position or consider [his] reliance interests," Porwancher has "demonstrated a strong likelihood of success that [his] termination [was] arbitrary and capricious[.]" *Colorado I*, 2025 WL 1017775 at *3.

### C. The termination was contrary to law.

The termination of Porwancher's Public Scholar award is contrary to law because it violates a set of regulations known as the Uniform Administrative Requirements (UAR) that dictate the administration of NEH grants. 2 C.F.R. §§ 200.0 *et seq*. The UAR were originally promulgated by the Office of Management and Budget (OMB) and subsequently adopted by NEH. 2 C.F.R. § 3374.1. Although OMB updates to those regulations became effective in October 2024, NEH opted not to apply the new regulations retroactively to extant grantees.[20] Therefore, grantees such as Porwancher (whose funds were obligated in August 2024) are governed by the regulations that became effective on November 12, 2020. The Termination Notice violated those regulations in four ways.

*First*, the Notice failed to provide an objections process. The Notice stated: "Your grant no longer effectuates the . . . conditions of the Grant Agreement and is subject to termination[.]" Ex. M. Because the termination was a "remedy for noncompliance" with

---

[20] NEH, *Update on the 2024 Revisions to 2 CFR 200* (June 25, 2024), https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200.

the grant conditions, NEH was required to provide "an opportunity to object and provide information and documentation challenging the . . . termination[.]" 2 C.F.R. § 200.342 (2020). But Defendants never gave Porwancher that opportunity. Ex. O (informing Porwancher that NEH was "unable to offer [him] a means of dispute resolution").

*Second*, the Notice failed to fulfill the requirement that it convey important information about an OMB database. When a grant is terminated for noncompliance with conditions, the notice "must state that . . . [t]he termination decision will be reported to the OMB–designated integrity and performance system . . . [and] the information will be available . . . for a period of five years[.]" 2 C.F.R. § 200.341(b)(1),(2) (2020). Further, the notice "must" make clear that if the recipient applies for another award, the future awarding agency "must consider that information in judging whether the [recipient] is qualified to receive the Federal award." *Id.* § 200.341(b)(3). And the Notice must inform the recipient that he is entitled to leave "comment[s]" in the OMB database, and that an awarding agency "will consider" that commentary in evaluating the prospective grantee. *Id.* § 200.341(b)(4), (5). In other words, Porwancher's termination, if not enjoined, will result in prejudice against his future applications for other federal awards. The above notice requirement protects grant recipients, like Porwancher, by providing them with a right to know about this prejudice and to mitigate it by submitting their own comments. But all of these details were simply left unmentioned in the Termination Notice. Ex. M.

By its own admission, the Notice abandoned the notification requirements, stating: "The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible." *Id.* True to form, the Notice failed to explain why terminating Porwancher's

grant was an urgent priority or to describe what exceptional circumstances required abandoning the traditional notification process. *Id.* Moreover, nothing in the regulations permits the NEH to forgo notification requirements under circumstances of any kind—exceptional or ordinary. *See* 2 C.F.R. § 200.341(b) (2020).

*Third*, Defendants failed to consider additional conditions that could have brought Professor Porwancher's award into compliance. NEH's regulations provide that it "may … terminate the Federal award" for "fail[ure] to comply with . . . the conditions," but only "[i]f the Federal awarding agency . . . determines that noncompliance cannot be remedied by imposing additional conditions." *Id.* § 200.339(c) (2020). But before Defendants terminated Porwancher's grant, they failed to first determine that his award's noncompliance was irremediable by additional conditions.

*Fourth*, the Termination Notice misconstrued—and violated—the NEH termination provision found at section 200.340(a)(2) (2020). Under that provision, a grant "may be terminated . . . to the greatest extent authorized by law, if [it] no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). The Notice relied on that provision by echoing the regulation's language, Ex. M, and interpreting the language to mean that the agency may terminate a grant that does not accord with *new priorities* adopted after the grant was awarded, *see supra* n. 18. That reading is incorrect. Rather, the most natural reading—as explained just below—is that termination is permitted if the agency learns *new information about the grant* revealing that the grant no longer effectuates the priorities that were in effect at the time the grant was awarded.[21]

---

[21] To Plaintiff's knowledge, no court has yet ruled on whether the provision allows retroactive application of new priorities—which is telling. Courts have not had occasion to rule on the issue because, prior to January 2025, agencies were not in the business of

**a.** To begin, the preamble that accompanied OMB's promulgation of the provision is inconsistent with the reading that Defendants now adopt. 85 Fed. Reg. 49506 (Aug. 13, 2020). That preamble makes plain that the provision is triggered when an agency learns new information about an existing award (rather than when the agency changes priorities). The preamble provides precisely two examples of how the provision applies, both of which involve the agency learning new information about a specific award:

> For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award. Further, additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award, such that it may be in the interest of the government to terminate the Federal award.

85 Fed. Reg. at 49507-08. Nothing in the preamble indicates an intent to confer on agencies the power to terminate grants based on post-award changes in priorities. Had the regulation contemplated such retroactivity, OMB would have said so. Thus, when "commenters expressed a concern that the proposed language w[ould] provide Federal agencies too much leverage to arbitrarily terminate awards," OMB assuaged those concerns, explaining that under the regulation "as written[,] agencies are not able to terminate grants arbitrarily." *Id.* at 49509. Defendants' current interpretation of section 200.340(a)(2) is impossible to square with those responses.

**b.** Moreover, the court should reject the government's interpretation because doing so would render the termination provision facially violative of the Spending Clause. *Infra* Part I(E) (explaining that Defendants' interpretation violates the Spending Clause by

---

weaponizing new priorities against existing grantees. *AACTE*, 2025 WL 833917 at *19 (noting the "relatively untested nature of and paucity of caselaw interpreting § 200.340" (quotation omitted).

imposing new priorities—or retroactive conditions—on grantees). As the D.C. Circuit has explained, the "canon of constitutional avoidance requires courts to interpret[ ] statutes to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction." *Woodhull Freedom Found. v. U.S.*, 72 F.4th 1286, 1302-03 (D.C. Cir. 2023) (quotation omitted).

**c**. For similar reasons, time-honored principles in our law abhor retroactivity as fundamentally unfair, counseling against the government's construal. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence . . . . Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly[.]" *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). Thus, "administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988). In that spirit, so too should this Court resist reading section 200.340(a)(2) (2020) as investing Defendants with power to upend grantees' lives on agency whim by retroactively invoking newfangled priorities to suddenly terminate extant grants, especially when the regulation's language does not require such an approach.

**d**. Finally, Defendants' interpretation makes little sense in the context of the Public Scholars program, which has consistently updated its priorities every year or two as new funding cycles are announced. In fact, five of six funding opportunities between 2017 and 2023 identified new priorities.[22] If NEH were authorized to retroactively cancel awards based on such changes, the agency could constantly defund awards from prior cycles. Such

---

[22] *Compare* Ex. Q at 4 (2017 cycle priorities), *with id.* at 8 (2018 cycle priorities), *with id.* at 12 (2019 cycle priorities), *with id.* at 17 (2020 and 2021 cycle priorities), *with id.* at X (2022 and 2023 cycle priorities), *with id.* at 23-24 (2024 cycle priorities).

a practice would lead to absurd results: it would require applicants to predict future priorities that the agency *might* adopt and then decide whether to tailor their proposal to the existing priorities or the future ones. Surely OMB did not contemplate this kind of exercise in prophecy when it promulgated the regulations that NEH has adopted.[23] These regulations were made not for the Oracle of Delphi but for mere mortals—like Porwancher.

### D.  The termination violated the Due Process Clause.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of . . . property, without due process of law." U.S. Const. amend. V. "An essential principle of due process is that a deprivation of . . . property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Esparraguera v. Dep't of Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quotation omitted). Further, the Supreme Court has long held that "agencies should provide . . . fair warning" of their policies, insisting that agencies cannot "unfair[ly] surprise" parties who develop a "good-faith reliance" on prior positions. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012) (quotations omitted). As the D.C. Circuit has explained, this "fair notice" doctrine is rooted in the Due Process Clause. *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) ("Due process requires that parties receive fair notice before being deprived of property."). The termination of Porwancher's grant violates these due process principles.

As a threshold matter, Porwancher has a property interest in his award because NEH entered into a grant agreement that created a "mutually explicit understanding[]" that NEH would provide the grant unless it was terminated by Porwancher himself *or* by NEH

---

[23] Nor is there any precedent for the NEH to rely on section 200.340(a)(2) (2020) in such a retroactive manner. To Plaintiff's knowledge, although the 2020 regulations were in effect from 2020 to 2024, the NEH updated its priorities several times and yet never cancelled awards from prior cycles based on new priorities prior to April 2025.

for his noncompliance with terms and conditions. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). As courts have recognized, property interests can be established by "legitimate and reasonable reliance on a promise from the government." *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) (quotation omitted); *see also, e.g., Cnty. of Santa Clara v. Trump (Santa Clara II)*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part on other grounds, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) (finding property interest in "congressionally appropriated funds" because the recipients had "more than a unilateral expectation" in the funds).

Here, Porwancher's grant agreement "award[s]" $60,000 in funds that "will be processed" in four payments and further specifies that the award is "subject to the terms and conditions contained in the General Information on NEH Public Scholar Program Awards, available on the NEH website[.]" Ex. E at 1. Those terms and conditions in turn provide only two circumstances under which the grant can be terminated—*i.e.*, if the grantee "choose[s] to discontinue the proposed program . . . or fail[s] to observe the award's terms and conditions." Ex. B. at 24. Porwancher thus has a property interest because "the government has fostered . . . [an] understanding[] which entitle[d] [Porwancher] to believe that [he] would lose [his grant] only for" noncompliance. *Esparraguera*, 101 F.4th at 33; *cf. Nat'l Juv. Law Ctr., Inc. v. Regnery*, 738 F.2d 455, 459 (D.C. Cir. 1984) (whether grantee had property interest depended on whether grantee had a "reasonable expectation[] of continued government funding"). The termination of Porwancher's grant deprives him of this property interest in violation of his due process rights in two ways.

*First*, Defendants failed to provide Porwancher with "proper notice" and an "opportunity for [a] hearing" before terminating his grant. *Esparraguera*, 101 F.4th at 40.

With respect to the former, the Termination Notice was inadequate both because it did not "precede[]" the award termination and because it failed to provide Porwancher with "the factual basis for the action." *Id*. Indeed, the Notice did not even indicate which condition Porwancher failed to comply with, much less how he was noncompliant. Ex. M. Nor did Defendants provide Porwancher with a hearing. Rather, NEH stated explicitly that it was "unable to offer [him] a means of dispute resolution[.]" Ex. O.

*Second*, Defendants failed to provide Porwancher with fair notice of their policy that his award could be terminated for reasons other than noncompliance. As noted above, the grant agreement indicates that the award would not be terminated by NEH unless Porwancher failed to comply with the terms and conditions. Ex. E at 1; Ex. B at 24. Relying on this expectation, Porwancher made plans to take leave from ASU during the 2025-2026 academic year, as required by those same terms and conditions. AP Decl. ¶¶ 21-24. But the Termination Notice stated that the grant was terminated in part for reasons wholly unrelated to noncompliance, including: (1) that the "grant no longer effectuates the agency's needs and priorities," (2) that NEH is "repurposing its funding allocations in a new direction," and (3) that an "executive order mandates that the NEH eliminate all non-statutorily required activities and functions." Ex. M. In so doing, the Notice did not consider Porwancher's substantial reliance interests, *see supra* at 28-29; *infra* at 41-42, that were grounded in the prior understanding that his grant would not be terminated for reasons entirely outside of his control. Given Porwancher's "good-faith reliance" on the agency's prior communications, fundamental principles of due process prohibit the government from "unfair[ly] surpris[ing]" him in this way. *Christopher*, 567 U.S. at 156-57; *Gen. Elec. Co.*, 53 F.3d at 1328-29 (due process requires "fair notice"); *Cemex*, 560 F.Supp.3d at 281-

82 (Nichols, J.) (agency likely violated the Due Process clause where it failed to provide fair notice and take into account reliance interests when changing course).

### E.  The termination violated the Spending Clause.

The Termination Notice also violated the Spending Clause, which vests Congress with the power to decide how appropriated dollars should be spent for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Supreme Court has made clear that although the Spending Clause allows Congress—and by delegation the Executive Branch—to impose conditions on funds, the "legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms[.]" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Accordingly, the spending power "does not include surprising [fund recipients] with post acceptance or 'retroactive' conditions." *Id.* at 25. Further, "if Congress desires to condition [a recipient's] receipt of federal funds, it must do so unambiguously . . . , enab[ling] the [recipients] to exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quotations omitted).

The Termination Notice violated this requirement by "surprising [Porwancher] with post acceptance or retroactive conditions" in two ways. *Pennhurst*, 451 U.S. at 25. First, as explained above, he was unaware that his grant could be terminated by the agency if NEH chose to adopt new priorities. *Supra* at 34-35. And second, any new priorities adopted "post acceptance" are themselves "retroactive conditions." *Pennhurst*, 451 U.S. at 25. Porwancher was therefore not able to "exercise [his] choice" to accept his grant "knowingly" and was not "cognizant of the consequences of [his] participation," as required by the Spending Clause. *South Dakota*, 483 U.S. at 207. He had no way of knowing that the rug could be pulled out from under him at the agency's whim, nor any

means to ensure that his project would comply with any new agency priorities adopted after his acceptance.

### F. The termination was *ultra vires*.

The Constitution gives Congress the authority to create federal agencies and prescribe their duties. U.S. Const. art. I, § 8, cl. 18. Agencies thus "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). An agency may not "operate independently of" statutory authority. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quotations omitted).

Defendants cannot dispute that DOGE terminated nearly 1500 NEH grants, including Porwancher's grant, without NEH input. Former or current NEH employees with personal knowledge have attested to this fact in declarations filed in other litigation challenging the NEH grant terminations. Ex. U at 1-2, 4, 6. NEH Acting Chairman McDonald also repeatedly conceded in a staff meeting that DOGE carried out the terminations and that McDonald lacked control over the process. He described DOGE as having written and transmitted the terminations, explaining that "they said in the notification letter that . . . they would not be adhering to the traditional notification processes."[24] Although McDonald "had certainly pointed out to [DOGE] what [NEH's] traditional notification processes were," DOGE "did not feel those should be applied in this instance."[25] When asked why DOGE departed from the agency's processes, McDonald replied "because that's the way DOGE had operated at other agencies and they applied the

---

[24] NEH SLT Meeting Recording - 04/03-2025, *supra* 8 n. 4, at 7:04.
[25] *Id.* at 7:14.

same methodology here."[26] Further, McDonald could not even answer a question about the number of grants terminated, stating it would be "conjecture" on his part.[27] NEH communications with grantees in the days following confirmed that DOGE was responsible and that "NEH [did] not know the full scope of which awards [had] been terminated." Ex. T at 5. Further, the terminations were not processed in NEH's grants management system, Ex. U at 10, and came from a non-government Microsoft email address, Ex. L.

DOGE has no legal authority to terminate NEH's grants. Congress did not create DOGE and has not vested DOGE with any powers. Rather, as a creation of the President, DOGE's authority is limited, at best, to advising the President. It lacks any legal power to carry out or alter the statutorily prescribed programs of another agency. Other courts have recognized that DOGE lacks such legal authority. In denying a motion to dismiss, a court in this district found that the government "points to no legal source that grants [DOGE] the authority to" "direct[] operations . . . at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities." *AFL-CIO v. Dep't of Lab.*, --- F.Supp.3d ---, 2025 WL 1129227 at *22 (D.D.C. Apr. 16, 2025). Another court similarly concluded that plaintiffs sufficiently alleged that DOGE has "no statutory authority with respect to OPM records." *AFGE v. OPM*, --- F.Supp.3d ---, 2025 WL 996542 at *20 (S.D.N.Y. Apr. 3, 2025). Because DOGE lacked legal authority to terminate Porwancher's grant, the termination was *ultra vires* and should be enjoined.

---

[26] *Id.* at 10:30.
[27] *Id.* at 8:20.

## II.    Plaintiff Will Suffer Irreparable Injury Absent Preliminary Relief.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Porwancher will suffer such harm if his grant is not reinstated quickly.

*First*, absent relief prior to the fall semester—which begins on August 21, 2025, AP Decl. ¶ 39—Porwancher will be unable to take leave this academic year to work on his book, *id.* ¶ 27. Plaintiffs suffer "injury for . . . irreparable harm" where the challenged action "unquestionably make[s] it more difficult for [plaintiffs] to accomplish their primary mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Accordingly, courts have found irreparable harm where plaintiffs, like Porwancher, were "forced to stop . . . research projects" as a result of grant terminations. *New York I,* 2025 WL 715621 at *14. *See also Mass. v. NIH*, --- F.Supp.3d ---, 2025 WL 702163 at *30 (D. Mass. Mar. 5, 2025) (on appeal) ("loss of direct research" was irreparable harm).

Indeed, deprived of both his award and the time to work on his book, Porwancher will suffer a downstream delay in all of the benefits that would flow from both the prestige of the grant itself and the accelerated publication of his book, including increased mobility on the job market, speaking engagements, possibly book prizes, and a merit-based raise. AP Decl. ¶¶ 28-34. These delays matter. To take just one example, the academic hiring cycle begins in the summer. If a job opportunity in American Jewish history were announced at a highly ranked university in July or August, Porwancher's application would benefit significantly from having the Public Scholar award on his resume—an advantage he will be deprived of absent preliminary relief. *Id.* ¶ 34. Likewise, if he must wait until this litigation concludes for relief, his book publication will be substantially delayed, which will also have negative consequences for any job applications that he submits prior to the

book's publication. *Id.* Such consequences are all the weightier because the relevant job openings (for which Porwancher is eligible and would apply) are quite rare, with only approximately three each year in *the entire country*. *Id*. Thus, the "delay" in Porwancher's ability to work on his book, "even if only a few months, . . . represents precious productive time irretrievably lost to him." *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Woonasquatucket*, 2025 WL 1116157 at *22 (irreparable harm where grant freeze "resulted in a delay in the progress" on project because the grantee could "never get this time back").

*Second*, the grant termination has introduced significant "uncertainty" into Porwancher's life, "interfer[ing] with [his] ability to . . . plan for the future" and causing "irreparable harm." *Cnty of Santa Clara v. Trump (Santa Clara I)*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017); *Colorado I*, 2025 WL 1017775 at *4 (irreparable harm where grant termination caused "chaos and uncertainty"). If his grant is reinstated through preliminary relief, Porwancher can proceed with his planned leave. Conversely, if his grant is not reinstated prior to the fall semester, he will owe the university two courses in the fall. AP Decl. ¶ 41. But adding new courses so late in the game—indeed long after the course schedule has been set and students have started enrolling[28]—will be disruptive and difficult, *id.* ¶¶ 39, 41-43. Even if he were able to schedule courses at this late stage, doing so might create other problems: if he obtains preliminary relief, he would then have to cancel his classes at the eleventh hour to take up the grant, which would in turn upend the students' schedules and possibly derail their progress towards graduation. *Id.* ¶ 42.

---

[28] AP Decl. ¶ 22 ("Managing the department's course schedule is an intricate endeavor" and "the schedule is set about ten months in advance," with students "enrolling in their courses about six months in advance.").

Accordingly, if preliminary relief is not granted, Porwancher "will be obligated to take steps to mitigate the risk" of disrupting the course schedule and "these mitigating steps will cause [Porwancher] irreparable harm." *Santa Clara I*, 250 F. Supp. 3d at 537. Specifically, he will be forced to use up two "course releases," which each allow him to forgo teaching a course that he would otherwise owe. AP Decl. ¶ 44. Porwancher only has two such releases, making them a valuable and finite resource. *Id.* As noted in his declaration, Porwancher is currently trying to start a family with his wife and had planned on saving the releases to use during the precious months of his future child's infancy if his wife is fortunate enough to conceive. *Id.*¶ 46. The lost releases are an injury "for which legal remedies are inadequate." *Beattie*, 663 F. Supp. 2d at 9.

Likewise, Porwancher's previous plans for future grant applications have also been disrupted. AP Decl. ¶ 40. Nearly nine months before his grant termination, he had indicated to ASU's Fulbright liaison his intention to apply for the Fulbright program by the September 15, 2025 deadline. *Id.* If he received that award this cycle, he would be required to start the performance period by February 2027 at the latest. *Id.* But whether or not he will be free to do so is complicated by the termination of his Public Scholar award: if his grant is reinstated through preliminary relief, all will be well because he will start and end his year-long Public Scholar performance period on the original timeline. *Id.* But if his grant is reinstated only at the end of litigation, his performance period for the Public Scholar award could very well extend beyond the start date for the Fulbright—making it impossible for him to do the Fulbright. *Id.*

*Fourth*, Porwancher will suffer reputational harm and a decreased ability to apply for and receive federal grant funds. If Porwancher's Termination Notice is not set aside, it

will be reported to an OMB database so that future awarding agencies are aware of the termination when considering whether Porwancher is qualified to receive an award. *Supra* at 30. Such harms are not hypothetical, as Porwancher routinely applies for federal grants to support his research, including no fewer than eight grant applications between the years 2016 and 2024. AP Decl. ¶ 47. Indeed, Porwancher began making arrangements in 2024 to apply for a Fulbright award, the application for which is due September 15, 2025. *Id.* ¶ 40. That application will be negatively impacted by the current grant termination absent preliminary relief. Other courts have found similar injuries to constitute irreparable harm. *See, e.g.*, *Climate United*, 2025 WL 1131412 at *19 (terminations "will impact Plaintiffs' ability to apply for and receive federal . . . grant[s]"). *See also Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) (reputational harm was irreparable).

*Fifth*, Porwancher has already suffered and will continue to suffer irreparable harm because the Termination Notice deprived him of his constitutional right to due process. A plaintiff suffers irreparable harm from government action that "infringe[s]" on constitutional rights "the moment the government action takes place." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303 (irreparable harm from violation of establishment clause interests). *See also*, *e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (a plaintiff who suffers "a constitutional violation and injury" demonstrates "irreparable harm no matter how brief the violation.").

## III.    The Balance of Equities and the Public Interest Favor Plaintiff.

The balance of equities and the public interest favor a preliminary injunction. To begin, the termination of Porwancher's award serves no public interest and will cause Porwancher significant irreparable injury absent injunctive relief. *Supra* Part II.

Conversely, "[i]t is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. "To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation omitted).

Moreover, reinstating Porwancher's award will benefit the public because the award will fund humanities scholarship that is "written for the broad public" and that will reach "the broadest possible range of readers." Ex. D at 1. As Congress itself recognized when it created the NEH, "the humanities belong to all the people of the United States." 20 U.S.C. § 951(1). This wisdom applies to Porwancher's book project, which will provide readers with a historical blueprint for how our nation has previously quelled the fires of Jew-hatred. Surely, the government—and this Administration in particular—must agree that seeking to understand and combat the scourge of antisemitism is in the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his motion and enter a preliminary injunction.

Dated: June 2, 2025                     Respectfully submitted,

Professor Andrew Porwancher
SCETL–ASU
P.O. Box 870602
Tempe, Arizona 85287–0602
(602) 726-2110
porwancher@asu.edu

*Plaintiff*