# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Porwancher,

*Plaintiff,*

v.                                              Case No. 1:25-cv-01180-CJN

National Endowment for the Humanities, et al.,

*Defendants.*

# PLAINTIFF'S EMERGENCY MOTION TO COMPEL COMPLIANCE
## WITH THE COURT'S JULY 25 ORDER AND TO EXPEDITE TIME FOR RESPONSE

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

I.    NEH Priorities for Public Scholar Awards During Plaintiff's Funding Cycle Did Not Include A More Perfect Union............................................................................... 3

II.   Plaintiff's Award Nonetheless Aligns with A More Perfect Union. ................................. 5

III.  Porwancher's Grant Was Initially Cancelled as Part of the Mass Termination of Biden-era Grants ...................................................................................................... 7

IV.  NEH Adopted a New 250th Anniversary Priority for the Upcoming Public Scholar Competition.......................................................................................................... 7

V.   NEH Announced Grants in May 2025 That Indisputably Do Not Align with Either A More Perfect Union or the 250th Anniversary Priority. ...................................... 8

VI.  Procedural History and Re-Termination of Plaintiff's Award......................................... 10

ARGUMENT ................................................................................................................. 11

I.    The Re-Termination Violates the Priorities Provision by Invoking Post-Award Priorities: the 250th Anniversary and A More Perfect Union. ...................................... 13

II.   The Re-Termination Impermissibly Invokes the Priorities Provision because Plaintiff's Grant Actually Is Consistent with the New Priorities........................................ 15

III.  The Re-Termination Exceeds the Authority of the Priorities Provision Because the Re-Termination Is Not "Authorized by Law." ........................................................ 18

    a.   The Re-Termination is arbitrary and capricious. ......................................... 20

    b.   The Re-Termination Violates the Due Process Clause................................... 22

    c.   The Re-Termination Violates the Spending Clause's Clear Notice Requirement........ 24

IV.  The Administrative Appeal Process Does Not Preclude Review ..................................... 25

V.   The Court should Grant Expedited Briefing on This Motion. ......................................... 26

CONCLUSION .............................................................................................................. 27

## INTRODUCTION

The National Endowment for the Humanities (NEH) terminated Plaintiff Andrew Porwancher's grant in a mass purge. This Court subsequently enjoined NEH from treating his grant as terminated or taking further action violative of agency regulations. The agency could have complied by no longer treating Porwancher's grant as terminated. NEH would not abide that result. But neither could NEH re-terminate Porwancher's grant without running afoul of the Court's Order. After all, any termination would need to rest on the premise that his grant diverged from agency priorities. And Porwancher's grant project—about the historic triumph of religious liberty in U.S. history—directly aligns with NEH's paramount emphasis on the legacy of America's founding ideals. The agency thus faced a choice: rescind the first termination or defy this Court's Order with a baseless re-termination. NEH chose the latter.

Among other NEH regulations, the Court's July 25 Order requires NEH to comply with 2 C.F.R. § 200.340(a) when taking any action regarding Porwancher's grant. A week after this Court issued its Order, NEH re-terminated Porwancher's award based on the erroneous claim that the grant does not "substantively align" with two NEH priorities: a priority to celebrate the 250th Anniversary of America's Founding (the 250th Anniversary Priority) and an agency-wide initiative titled *A More Perfect Union*. The Re-Termination violates Section 200.340(a) for three reasons. *First*, the two priorities invoked by NEH did not govern the Public Scholar program for the funding cycle under which Porwancher applied for and received his award. Thus, NEH's reliance on those priorities to re-terminate Plaintiff's grant constitutes impermissible *post hoc* conditions on his award. The agency notably has not imposed *post hoc* conditions on other grantees that were selected under the current Administration. *Second*, even if those two priorities had governed Porwancher's funding cycle, NEH's own records are indisputable that his grant directly

aligns with and effectuates both priorities. *Third*, the Re-Termination exceeds Section 200.340(a)'s authority—which allows terminations only to the "extent authorized by law"—because the Re-Termination violates three other sources of law: the arbitrary and capricious provision of the APA, the Due Process Clause, and the Spending Clause.

Plaintiff thus respectfully requests that this Court order NEH to comply with the July 25 Order by enjoining NEH from treating Plaintiff's grant as terminated under either the April 3 Termination Notice or the August 1 Re-Termination Notice.[1] Defendants have sandbagged Plaintiff by re-terminating his grant on the day his performance period began, and so Plaintiff also requests that the Court expedite briefing to ensure that he does not suffer irreparable harm. This Court has already concluded that if an unlawful termination of Plaintiff's grant is not preliminarily set aside, he will suffer irreparable harm because he will be forced to use up two course releases and lose valuable time on his book project. The fall 2025 semester begins imminently—on August 21—at which point Plaintiff will have to burn through those releases. Plaintiff therefore proposes in this motion an accelerated briefing schedule that would afford this Court time to issue a ruling and for Defendants to comply by August 20. If Defendants are able to exploit the default briefing schedule to run out the clock on Porwancher, they will effectively be rewarded for having ambushed him at the 11th hour with yet another unlawful termination. Plaintiff respectfully requests that this Court ensure Defendants do not reap such undue benefits.

---

[1] Pursuant to Local Rule 7(m), Plaintiff has conferred with counsel for Defendants, who oppose this motion.

## BACKGROUND

I.    **NEH Priorities for Public Scholar Awards During Plaintiff's Funding Cycle Did Not Include A More Perfect Union.**

The key documents through which NEH communicates it specific agency priorities for respective grant programs are known as Notices of Funding Opportunity (NOFO).[2] Each NOFO governs a particular funding cycle.[3] NEH can—and has—changed the priorities for its various grant programs from funding cycle to funding cycle. Some NOFOs state that NEH priorities for the given program include projects that speak to agency-wide strategic initiatives; other NOFOs do not. In other words, when NEH adopts a strategic initiative, that initiative does not necessarily translate into agency priorities for a particular grant program in a given cycle.

Such was the case when Porwancher applied for his Public Scholar award in 2023. The agency had already launched the *A More Perfect Union* initiative but did not identify that initiative as a priority for the Public Scholar program during Porwancher's funding cycle.

NEH first launched *A More Perfect Union* as an agency-wide initiative in 2019 and it has remained in place ever since. Ex. A. According to NEH, the initiative's purpose is to "help Americans better understand the world's oldest constitutional democracy and how our founding ideals are met in a pluralistic society." *Id.* at 2. The current website for *A More Perfect Union* further explains that those founding ideals include "equality" and "liberty." Ex. B. at 1. The initiative was created with an eye toward "the upcoming 250th anniversary of the founding of the

---

[2] *See, e.g.*, NEH, *Press Release - An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders* (Apr. 24, 2025), https://tinyurl.com/yckfcey7 (directing applicants to "consult the NOFOs for each program regarding . . . the program's aims" because they may differ from agency-wide priorities).

[3] Plaintiff uses the term "funding cycle" to refer to the cycle of grant applications and awards made under a particular NOFO. Some NOFOs cover two consecutive rounds of applications, while others cover only a single application round.

United States," which will take place on July 4, 2026 to celebrate the adoption of the Declaration of Independence. Ex. A. at 2. The anniversary is also referred to as the "Semiquincentennial." *Id.* In describing *A More Perfect Union*, NEH explains, "This historic milestone is an opportunity for Americans to reflect on the nation's past." Ex. B. at 1.

That NEH varies its priorities for the Public Scholars program with each funding cycle speaks to the import of looking to a specific NOFO—rather than to the existence of a longstanding agency-wide initiative—as the indicator of agency priorities for that program in a given cycle. For example, in the NOFO governing Public Scholar applications in the cycle before Porwancher applied, NEH said that it would consider applications for projects "in all areas of the humanities," Ex. C at 1, but identified "Areas of Interest" that "NEH [was] especially interested in supporting," *id* at 2. Those Areas of Interest included two agency-wide initiatives: *A More Perfect Union* and *Standing Together*. *Id.*

But in Plaintiff's own funding cycle, NEH explicitly declined to narrow its priorities to specific topic areas that NEH wished to fund. Ex. D at 1. Rather, NEH "welcome[d] projects in all areas of the humanities, regardless of geographic or chronological focus." *Id.* Notably, that NOFO said nothing about any agency-wide initiatives, much less *A More Perfect Union*. *Id.*[4]

For applications due the funding cycle after Plaintiff's, NEH published a NOFO that identified three agency-wide initiatives as "Areas of Interest" that "NEH [was] especially interested in supporting." Ex. E at 2. These three initiatives were: (1) *American Tapestry*, (2) *United We Stand*, and (3) the *Federal Indian Boarding School* initiative. *Id.* at 2-3. As was true of Plaintiff's cycle, the subsequent NOFO did not invoke the *A More Perfect Union* initiative. *Id.*

---

[4] Nor did the NOFO mention the 250th Anniversary Priority that NEH would later invoke in the Re-Termination of Porwancher's award—after all that priority did not yet exist. *Infra* at 7-8.

In sum, when NEH wants to translate *A More Perfect Union* into priorities for a given NOFO, it does so expressly. When NEH declines to even mention *A More Perfect Union* in a given NOFO, the agency is signaling that its priorities for that cycle do not implicate that initiative.

## II.    Plaintiff's Award Nonetheless Aligns with *A More Perfect Union*.

Although the NOFO for Porwancher's funding cycle did not narrow NEH's priorities to any specific topics, his project—*The Great Jewish Lunacy Trial*—nevertheless did align with *A More Perfect Union*. As noted, that initiative supports projects that focus on how "our founding ideals"—such as "equality" and "liberty"—"are met in a pluralistic society." *Supra* at 3. Porwancher was well aware of *A More Perfect Union* and knew that his book project directly advanced that initiative. And so—despite the fact that the relevant NOFO did not cite *A More Perfect Union* as a priority for that cycle—Porwancher nevertheless discussed the initiative in his application. That application explained: "By exploring the historical development of a core principle of constitutional democracy—the free exercise of faith—*The Great Jewish Lunacy Trial* harmonizes with the civic-minded goals of NEH's initiative, 'A More Perfect Union.'" Ex. F at 1.

Indeed, Plaintiff's application made plain precisely how his book contributes to our understanding of free exercise. It related that the book will cover the "sensational trial" that would determine whether "a convert to Judaism"—Warder Cresson—"would be confined to a 'lunatic asylum' for adopting the Jewish faith." *Id.* The application stated further that the trial became a "momentous test case for religious freedom," was a "turning point in the larger battle for religious freedom in America," and "speaks to the very heart of America's self-definition." *Id.* The application continued: "Since the founding, Americans have grappled with a fateful question: will the promise of equality enshrined in the Declaration of Independence be fulfilled or forsaken?" *Id.* Porwancher's answer was the former: the "Cresson verdict was of vast consequence" because it showed that "a commitment to religious equality had real purchase on American life." *Id.* In sum,

"Cresson's legal fight palpably and positively affected the course of religious liberty in America."
*Id.* at 2. In other words, Porwancher's application was explicit that his book project is about the
legacy of the American Founding—specifically, its premium on religious freedom.

NEH's own records—including the expert evaluations of his application—demonstrate
that Porwancher's book project centrally concerns the ideal of freedom in American history. The
application underwent a rigorous peer review process, through which four outside experts
reviewed his application and "advised [NEH] about [the project's] merits." Ex. G at 1. These
experts provided final ratings for the application of "Very Good" and "Excellent." *Id.* at 2-4. The
expert reviewers also specifically remarked on the project's relevance to religious liberty and free
speech. The first reviewer noted that the project explores "freedom of religious expression." *Id.* at
1. The third reviewer found that the project is an "important scholarly intervention into freedom
of speech, and the significance of state court records to legal debate about religious freedom." *Id.*
3. And the fourth reviewer concluded that project "addresses significant issues about American
religious freedom." *Id.* at 3-4.

Between Porwancher's application and the expert evaluations, the agency was fully
apprised about his book's relevance to religious liberty when NEH awarded him a Public Scholar
grant in August 2024. Porwancher was one of only 25 Public Scholars selected out of a pool of
283 applications, reflecting NEH's own estimation that his book stood among "the nation's most
significant humanities projects" and would join the "list of distinguished contributions to the
humanities." Ex. H at 1. The agency also posted a description of his project on its website, which
remains live as of the date of this filing. Ex. I. As the NEH website currently states, Porwancher's
project concerns "a fateful test case for religious liberty at large" and "illustrate[s] the struggle
for—and the stakes of—that quintessentially American promise: religious equality." *Id*

### III.    Porwancher's Grant Was Initially Cancelled as Part of the Mass Termination of Biden-era Grants.

The agency has a history of unlawfully terminating Porwancher's grant. On April 2 and 3, as already recounted in prior filings, Defendants conducted a mass termination of approximately 1400 grants, wiping out nearly all NEH grants issued by the prior administration, including Porwancher's award. ECF No. 9-1 at 7-9. In a boilerplate notice that was sent to grant recipients, NEH terminated Porwancher's grant for "several" nonsensical reasons. ECF No. 9-15. For example, the notice stated that Porwancher's grant no longer "effectuates . . . the conditions of the Grant Agreement," *id.,* even though he had not even begun his performance period and so could not be out of compliance with the conditions. The notice also claimed that Executive Order 14217 "mandates that NEH eliminate all non-statutorily required activities," ECF No. 9-15, even though that order does not mention NEH, let alone require the agency to shrink itself.[5]

### IV.    NEH Adopted a New 250th Anniversary Priority for the Upcoming Public Scholar Competition.

In spring 2025, NEH established a new priority for the Public Scholar program: a "Special Focus in Honor of the 250th Anniversary of America's Founding" (250th Anniversary Priority). Ex. J at 1. (NEH would later invoke this priority in its Re-Termination of Porwancher's grant.) As discussed further below, this Priority is nearly identical in theme with the *A More Perfect Union* initiative in that they both support projects that explore how America's "founding ideals have been met over time" in honor of the 250th Anniversary. *See id.* at 1.

To understand NEH's conception of the 250th Anniversary Priority, it is instructive to turn to NEH's current Public Scholar NOFO, which now limits the program's scope to align with this

---

[5] Executive Order 14217, *Commencing the Reduction of the Federal Bureaucracy* (Feb. 19, 2025).

new priority.[6] That NOFO states: "In honor of the upcoming 250th anniversary of America's Founding, the 2025-26 Public Scholars competition will accept applications only for projects that promote a deeper understanding of our nation's extraordinary heritage, including our record of advancing liberty[.]" *Id.* at 1. The NOFO makes clear that the emphasis on America's Founding does not preclude projects on later time periods: "Competitive applications will focus on topics in American history . . . . in any period from the Colonial Era to the present that increase public knowledge of the 250th anniversary of American Independence and American exceptionalism. Projects might explore the origins of the world's oldest constitutional democracy, or how its founding ideals have been met over time[.]" *Id.* In other words, NEH's conception of the 250th Anniversary Priority is hardly limited to the era of the American Revolution.

## V.    NEH Announced Grants in May 2025 That Indisputably Do Not Align with Either *A More Perfect Union* or the 250th Anniversary Priority.

Notwithstanding *A More Perfect Union* and the 250th Anniversary Priority, NEH has not retroactively terminated grants that were chosen by the current Administration—even when those grants fall outside those two priorities. In May 2025, NEH announced a slate of new grants it would fund, including Public Scholar awards. Ex. K. These newly announced Public Scholar recipients submitted their applications last year under an earlier NOFO that mentioned neither *A More Perfect Union* nor the yet-to-be-conceived 250th Anniversary Priority. *See* Ex. E at 2-3; *supra* at 8 n. 6. Accordingly, the May 2025 awards included a Public Scholar grant for a project on "the history of Jerusalem from 1099-1187"—a topic that has nothing to do with American

---

[6] The current NOFO that governs 2025 applications is a revised version of a NOFO that was originally published on June 3, 2024 and which governed two application rounds: applications due in 2024 (for awards announced in spring 2025) and applications due in 2025 (for awards to be announced in spring 2026). *See* Ex. J at i (describing revisions to the NOFO). The old version of the same NOFO—which was in place at the time that applications were submitted in 2024—is at Exhibit E.

history, much less *A More Perfect Union* or the 250th Anniversary Priority. Ex. K at 2. The divergence between that project and the aforementioned priorities did not preclude NEH from funding the project in the first instance, nor did those priorities move NEH to subsequently terminate it. NEH remains perfectly content—notwithstanding *A More Perfect Union* and the 250th Anniversary Priority—to fund a book about the history of a city on another continent during the Middle Ages.

Similarly, NEH runs a program called "Summer Stipends" that has followed the same pattern: (1) the most recent NOFO did not mention either *A More Perfect Union* or the 250th Anniversary Priority, Ex. L at 2-3, (2) the current Administration announced a new round of Summer Stipend grant winners in May 2025, and (3) numerous winners among them are pursuing projects far afield from American history, with no relevance to America's founding ideals. Those project topics include:

- <u>Music for an Imagined Liturgy: Atmospheres and Institutions of Russian Orthodoxy, 1878–1918</u> which investigates "Russian Orthodox sacred music . . . in Eastern Europe[.]" Ex. K at 3.

- <u>The Linguistics of Writing in the Ancient Mediterranean</u> which analyzes "Cypriot, Linear B, and Paleo-Hispanic syllabic scripts[.]" *Id.* at 11.

- <u>Soldiering Toward Modernity</u> about "the use of for-profit contract regiments in 18th- and 19th-century Europe." *Id.* at 12.

- <u>Stranger than Fiction: The First Biography of Mary Shelley</u> about the English novelist who wrote *Frankenstein. Id.* at 5-6.

- <u>A Forbidden Fruit? Sacred Music in the USSR before Its Fall</u> which explores "musical composition and religious revival in the Soviet Union [.]" *Id.* at 8.

- <u>Practical Democracy: Cultivating a New Postwar Japan, 1945–1955</u> which researches "how Japanese institutions of everyday life helped build a popular mindset[.]" *Id.* at 12.

- <u>The Gothic Apprentice</u> about "the English artist, poet, and printer William Blake (1757–1827)[.]" *Id.* at 5.

- <u>The Letters of Jean Ingelow</u> which supports "[r]esearch and writing" on the "British poet, novelist, and children's author Jean Ingelow (1820-1897)." *Id.* at 13-14.

To be sure, the foregoing examples do not exhaust the list of NEH projects announced in May 2025 that cover topics well beyond America's founding ideals. Moreover, no specialized training in the humanities is required to discern that a project on Paleo-Hispanic syllabic scripts or Eastern European music is *not* substantively aligned with *A More Perfect Union* or the 250th Anniversary Priority. And yet these projects—selected by the current Administration—remain immune from termination.

**VI.    Procedural History and Re-Termination of Plaintiff's Award.**

The Court is by now well aware of the procedural history of this case. Defendants first cancelled Plaintiff's grant on April 3 as part of the Mass Termination. ECF No. 9-15. Plaintiff moved for a preliminary injunction on June 2, requesting that this Court rule on his motion prior to the first day of Plaintiff's performance period (August 1) so that Plaintiff, if he prevailed, could begin the grant on time and avoid various irreparable harms. Pl.'s Mot. for Prelim. Inj. at 1 & n. 1, ECF No. 9. The Court granted that relief on July 25. *Porwancher v. NEH*, --- F.Supp.3d ----, 25-cv-1180, 2025 WL 2097740 at *6 (D.D.C. July 25, 2025); *See also* Order, ECF No. 21. The Court's Order preliminarily enjoined NEH "from treating Plaintiff[]'s grant as terminated" and "from future actions regarding that grant unless it complies with the procedural requirements contained in" various NEH regulations. ECF No. 21.

The day after the Court issued its PI Order, Plaintiff messaged NEH to inquire about the agency's plans to comply. Ex. M. By Tuesday, July 29, Plaintiff had not received a response and his grant was still classified as terminated in the agency's portal. Plaintiff thus emailed counsel for Defendants with the same question, noting that his grant remained classified as terminated in the

portal. Ex. N at 1-2. Opposing counsel replied that she had "forwarded [Plaintiff's] message to NEH so that it can make any necessary corrections to its portal." *Id.* at 1.

That response would turn out to be misleading. Although the Court's PI Order was in place since July 25, NEH continued to "treat Plaintiff['s] grant as terminated" in NEH's online portal in direct violation of the Order. ECF No. 21. Finally, at 3:53 pm EST on August 1—an hour before close of business on the first day of Plaintiff's performance period—NEH sent Plaintiff a second termination notice. Ex. O. That Re-Termination Notice provides the following rationale:

> In accordance with 2 CFR § 200.340(a)(4), NEH has determined that this grant no longer effectuates the agency's programmatic priorities or needs. As described in Executive Order 14189, *"Celebrating America's 250th Birthday"* and Executive Order 14222, *"Department of Government Efficiency,"* NEH is reallocating resources to support the Administration's directives related to the Semiquincentennial. The agency is currently emphasizing humanities projects that reflect on America's founding, celebrate the nation's cultural heritage, and expand access to foundational documents. NEH has concluded that your proposed book project does not substantively align with the agency's current strategic initiatives, including the *A More Perfect Union* initiative.

The Re-Termination Notice further provided that the termination was "effective August 1, 2025"—the same day it was sent. *Id.* at 1.

## ARGUMENT

The Re-Termination violates the Court's July 25 Order because the Re-Termination does not "compl[y] with the procedural requirements contained in 2 C.F.R. § 200.340(a)." ECF No. 21.

The 2020 version of Section 200.340(a) provides that federal agencies may terminate awards under only five circumstances: (1) if a grantee fails to comply with the grant terms and conditions, (2) "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities," (the Priorities Provision) (3) if the grantee consents to the termination, (4) if the grantee decides to terminate, and (5) pursuant to the grant's termination

provisions. 2 C.F.R. § 200.340(a) (2020). To comply with Section 200.340(a) while terminating Plaintiff's award, NEH must establish that one of these circumstances justifies a termination.

The Re-Termination invokes the Priorities Provision at Section 200.340(a)(2), asserting that Plaintiff's grant "no longer effectuates the agency's programmatic priorities or needs." Ex. O.[7] NEH does not—and could not—invoke the other four provisions.[8] In other words, the Re-Termination complies with Section 200.340(a) only if NEH has properly invoked the Priorities Provision at Section 200.340(a)(2).

But the Re-Termination is *not* a proper exercise of that provision for three reasons. First, the Re-Termination has impermissibly terminated Plaintiff's grant based on two priorities that did not apply to the Public Scholar program for Plaintiff's funding cycle: *A More Perfect Union* and the 250th Anniversary. Second, even if those priorities had applied to Plaintiff's grant, the record evidence—including the description of his project on NEH's own website—is indisputable that Plaintiff's grant is consistent with those priorities. Third, the Re-Termination violates other sources of law and therefore exceeds the authority provided by the Priorities Provision, which allows terminations only to the "extent authorized by law."

---

[7] The Re-Termination Notice mistakenly cites the 2024 version of this provision: 2 C.F.R. 200.340(a)(4) (2024). As previously explained, the 2020 version of this regulation applies to Porwancher's grant. *Porwancher*, 2025 WL 2097740 at *1.

[8] Subsections 200.340(a)(1), (3), and (4) are inapplicable because Plaintiff is not in violation of the terms and conditions of his grant, does not consent to the termination, and has not decided to terminate his own grant. Nor could the agency invoke Section 200.340(a)(5) because the termination provisions of Plaintiff's grant allow for termination only if Plaintiff has violated his conditions or if Plaintiff himself chooses to terminate the grant early. ECF No. 9-4 at 24. As just noted, neither condition is met.

**I.    The Re-Termination Violates the Priorities Provision by Invoking Post-Award Priorities: the 250th Anniversary and *A More Perfect Union*.**

As already explained in Plaintiff's preliminary injunction brief, the Priorities Provision does not authorize agencies to terminate awards unless the cited priorities governed the grant program for the relevant funding cycle. *See* Mem. In Supp. of Pl.'s Mot. for Prelim. Inj. (PI Br.) at 31-34, ECF No. 9-1. In other words, the Provision permits an agency to terminate only if the agency learns *new information about the grant* revealing that the grant no longer effectuates the priorities that were in effect for the program during the applicable funding cycle. *Id.*

Because Plaintiff has already fulsomely made these arguments in his prior papers, he does not repeat them at length here. To recap briefly, Plaintiff argued (1) that the preamble to the regulation confirms that the Priorities Provision does not allow termination based on priorities adopted for the given grant program after the award is issued, *id.* at 32; (2) that NEH's interpretation to the contrary would lead to a facial violation of the Spending Clause, *id.* at 32-33; (3) that NEH's interpretation runs afoul of time-honored principles in our law that abhor retroactivity for its fundamental unfairness, *id.* at 33, and (4) that NEH's interpretation would allow the agency to constantly defund projects, as the Public Scholar program's priorities change with each funding cycle, *id.* at 33-34.[9] In sum, NEH may terminate under the Priorities Provision only if it establishes that Porwancher's grant does not effectuate the priorities that governed the Public Scholar program for his funding cycle.

---

[9] To Plaintiff's knowledge, no court has yet ruled on whether the provision allows retroactive application of new priorities—which is telling. Courts have not had occasion to rule on the issue because, prior to January 2025, agencies were not in the business of weaponizing new priorities against existing grantees. *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 770 F. Supp. 3d 822, 854 (D.D.C. 2025) (noting the "relatively untested nature of and paucity of caselaw interpreting § 200.340" (quotation omitted)).

The Re-Termination violates that limitation because it relied on priorities that did not apply to the Public Scholar program during Porwancher's funding cycle. As explained above, Plaintiff submitted his application in 2023. Unlike during the funding cycles before and after Plaintiff's, *supra* at 3-4, NEH did not invoke any agency-wide strategic initiatives during Plaintiff's funding cycle. Ex. D at 1. Indeed, the agency stated only that it "welcome[d] projects in all areas of the humanities." *Id.* at 1. Yet, the Re-Termination has impermissibly terminated Porwancher's grant for two priorities that were not identified in the NOFO: (1) "support[ing] the Administration's directives related to the Semiquincentennial" by "emphasizing humanities projects that reflect on America's founding" (i.e., the 250th Anniversary Priority) and (2) the *A More Perfect Union* initiative. Ex. O.[10]

The unlawfulness of this action is underscored by NEH's disparate treatment of Porwancher. Even as NEH now retroactively applies these priorities to him, notably the agency has *not* applied them retroactively to grantees funded by the current Administration. Indeed, just three months ago in May, NEH announced new Public Scholar grants based on applications submitted in the most recent funding cycle. As noted, the NOFO for that cycle identified neither the 250th Anniversary nor *A More Perfect Union* as NEH priorities. Ex. E at 1-3. And despite adopting the 250th Anniversary Priority for upcoming Public Scholar applications, Ex. J at 1, NEH did not retroactively apply that priority when making awards in May based on the most recent NOFO. Instead, the agency chose to fund, for instance, a Public Scholar project that has nothing to do with American history at all: a book project on the history of medieval Jerusalem. Ex. K at

---

[10] Although *A More Perfect Union* has existed since 2019, that initiative was not a priority for the Public Scholar program for Plaintiff's funding cycle. As just explained, the relevant NOFO—unlike NOFOs in other cycles—explicitly welcomed projects in all areas of the humanities without identifying specific areas of interest.

2; *supra* at 9. At the same time, the agency also funded a slew of projects under other grant programs that have nothing to do with U.S. history. *Supra* at 9-10.

In other words, NEH applied the 250th Anniversary and *A More Perfect Union* Priorities to Porwancher's grant as the basis for Re-Termination, but at the same time NEH chose not to do the same for grants on non-U.S. topics that it selected under the current Administration. And every day that those grants remain intact is another day that NEH declines to retroactively apply the priorities cited in the Re-Termination Notice to those grantees. That latter decision is as it should be under the Priorities Provision, which does not allow terminations based on retroactive priorities.

## II.    The Re-Termination Impermissibly Invokes the Priorities Provision because Plaintiff's Grant Actually Is Consistent with the New Priorities.

Even if NEH were allowed to retroactively impose new priorities, the Re-Termination exceeds the authority of the Priorities Provision because Porwancher's grant is indisputably consistent with both the 250th Anniversary Priority and *A More Perfect Union*.

NEH may terminate pursuant to the Priorities Provision only "if [Plaintiff's] award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). In other words, in order to terminate under the provision, NEH must establish a factual predicate: that Porwancher's grant does not effectuate the agency's priorities. Here, NEH has not and cannot establish the necessary precondition because the record evidence makes clear—beyond a doubt— that Plaintiff's grant is substantively aligned with the priorities identified in the Re-Termination.

The Re-Termination Notice first invokes the 250th Anniversary Priority, noting that "NEH is reallocating resources to support the Administration's directives related to the Semiquincentennial" as "described in Executive Order 14189, *'Celebrating America's 250th.'*" Ex. O. As part of that effort, the Notice continues, the "agency is currently emphasizing humanities projects that reflect on America's founding[.]" *Id*. As discussed above, NEH has elaborated on this

priority in the current Public Scholars NOFO. Ex. J. Consistent with the Re-Termination's description of 250th Anniversary Priority, that NOFO states: "Competitive applications will focus on topics in American history . . . in any period from the Colonial Era to the present that increase public knowledge of the 250th anniversary of American Independence and American exceptionalism. Projects might explore the origins of the world's oldest constitutional democracy, or how its founding ideals have been met over time," including the nation's "record of advancing liberty." *Id*.

Porwancher's project is dedicated to just that: it explores how the founding ideals of the world's oldest constitutional democracy were met over time and documents a key moment in which the nation advanced religious liberty. His 2023 application explains that the project speaks to "the promise of equality enshrined in the Declaration of Independence" by demonstrating that "a commitment to religious equality had real purchase on American life." Ex. F at 1. The application recounts how Warder Cresson's lawyer "exalted the free exercise of faith as a principle." *Id.* It goes on: "The Cresson trial became an important touchstone for religious freedom cases throughout the country" as "Cresson's legal fight palpably and positively affected the course of religious liberty in America." *Id.* at 2.

Moreover, NEH's *own* records and public statements confirm what Porwancher's Public Scholar application already makes plain: his project is clearly about the historical advancement of our founding ideals regarding religious liberty. The expert evaluations from NEH's review of his application state in three different places that the project concerns both religious liberty and freedom of speech. Ex. G. at 1 (the project explores "freedom of religious expression."); *id.* at 3 (the project is an "important scholarly intervention into freedom of speech, and . . . religious freedom."); *id.* at 3-4 (the project "addresses significant issues about American religious

freedom."). And NEH's own website currently describes Porwancher's book as "illustrat[ing] the struggle for—and the stakes of—that quintessentially American promise: religious equality." Ex I; *see also id.* (noting that the Cresson trial was "a fateful test case for *religious liberty* at large." (emphasis added)). NEH cannot now speak out of both sides of its mouth—in one breath, the agency summarily claims that Porwancher's grant (about advancing liberty) does not "align" with the 250th Anniversary Priority, Ex. O; in the next breath, NEH insists that America's "record of advancing liberty" is central to that very priority, Ex. J at 1.

For similar reasons, the Re-Termination Notice is demonstrably false when it claims that Plaintiff's "proposed book project does not substantively align with the agency's current strategic initiatives, including the *A More Perfect Union* initiative." Ex. O. That initiative is nearly identical to the 250th Anniversary Priority. *Supra* at 7-8. As is true for the 250th Anniversary Priority, *A More Perfect Union* also celebrates "the 250th anniversary of the signing of the Declaration of Independence" by supporting projects that "advance civics education and knowledge of the nation's core principles of government," such as "equality [and] liberty." Ex. B at 1-2. As just explained, NEH's own records make clear that Porwancher's book project centrally concerns "the struggle for—and the stakes of—that quintessentially American promise: religious equality." Ex. I. It is especially damning for NEH that Porwancher's 2023 application expressly identified the affinity between his project and the goals of *A More Perfect Union*: "By exploring the historical development of a core principle of constitutional democracy—the free exercise of faith—*The Great Jewish Lunacy Trial* harmonizes with the civic-minded goals of NEH's initiative, 'A More Perfect Union.'" Ex. F at 1.

Tellingly, the Re-Termination Notice makes no effort to explain how Porwancher's specific grant runs afoul of agency priorities. Because it cannot. Porwancher's project harmonizes

with agency priorities so undeniably that any honest word about his book's substance would serve only to undermine the agency's conclusory statement that Plaintiff's "proposed book project does not substantively align" with NEH's agenda. Ex. O.

Nor is NEH's spurious claim saved by the deference courts typically afford an agency's factual determinations. Although review of agency action "is deferential," the Court is "not required to exhibit a naiveté from which ordinary citizens are free," especially where "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision." *Dep't of Commerce v. New York*, 588 U.S. 752, 784-85 (2019). Here, although NEH has summarily stated that Plaintiff's grant no longer effectuates its priorities, this Court need not blindly accept that assertion as true where it is plainly contradicted by record evidence. Indeed, it is well established that this Court need not defer to an agency's finding where that finding is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers' Ass'n of the U.S., Inc. v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983). There may be some cases that present close calls when applying this implausibility standard; Porwancher's case is not among them. If an agency can terminate a grant when the record evidence is this overwhelmingly counter to the agency's finding, then the mere incantation of the words "agency priorities" will justify most any pretextual termination.

In sum, the Re-Termination violates Section 200.340(a) because the factual prerequisite for that provision has not been met.

## III.    The Re-Termination Exceeds the Authority of the Priorities Provision Because the Re-Termination Is Not "Authorized by Law."

Although the Priorities Provision "allow[s] [agencies] to terminate grant awards that 'no longer effectuate[ ] the program goals or agency priorities,'" it does so "only *to the extent authorized by law.*'" *Green & Healthy Homes Initiatives, Inc. v. EPA*, --- F.Supp.3d ----, 2025 WL

1697463 at *21 (D. Md. June 17, 2025) (quoting 2 C.F.R. § 200.340(a)(4) (2024)) (emphasis

added), *pending appeal*, 25-1808 (4th Cir.). Emphasizing the italicized language, another court in

this district has explained that the language "establishes a boundary to ensure that when dealing

with federal awards, no agency exceeds the legal authority granted to them." *Climate United Fund*

*v. Citibank, N.A.,* --- F.Supp.3d ----, 2025 WL 1131412 at *16 (D.D.C. Apr. 16, 2025), *pending*

*appeal*, 25-5123 (D.C. Cir). Courts have thus applied this boundary to find that agencies exceed

their authority under the Priorities Provision when the termination violates other sources of law.

*See, e.g.*, *Green & Healthy Homes*, 2025 WL 1697463 at *21 (termination was not authorized by

200.340(a) where the termination was arbitrary and capricious in violation of the APA). Here, the

Re-Termination exceeds the authority—and thus violates—the Priorities Provision because the

Re-Termination violates three other sources of law: the APA's prohibition on arbitrary and

capricious agency action, the Due Process Clause, and the Spending Clause.

As an initial matter, the Court has jurisdiction to review the Re-Termination under these

sources of law. The Court has already found that it has jurisdiction to review the termination of

Porwancher's grant for violations of NEH's regulations, including 2 C.F.R. § 200.340(a).

*Porwancher*, 2025 WL 2097740 at *2-4. And because that regulation requires NEH terminations

to comply with other law, the Court may review the Re-Termination for such compliance.

Moreover, the Court independently has jurisdiction to review constitutional and arbitrary-and-

capricious claims for the same reasons it has jurisdiction to review contrary-to-law claims: (1) the

claims turn on federal law that "appl[ies] regardless of the grant's language" and (2) Plaintiff seeks

"prospective, nonmonetary relief to clarify future obligations." *Id.* at *3, 4.[11]

---

[11] Nor should the Supreme Court's recent stay order in *Department of Education v. California*,
145 S. Ct. 966 (2025), preclude the Court from reviewing NEH's compliance with the APA's
arbitrary and capricious standard. The district court order in that case ruled on an arbitrary-and-

### a. The Re-Termination is arbitrary and capricious.

Under Section 706 of the APA, a "reviewing court shall . . . hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Re-Termination Notice is arbitrary and capricious in five ways.

*First*, the Re-Termination was substantively unreasonable. *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between "substantive unreasonableness claims" and "lack-of-reasoned-explanation claims"). The Re-Termination hinges on its determination that Porwancher's grant does not "substantively align" with NEH's 250th Anniversary Priority and *A More Perfect Union* initiative. Ex. O. Yet that determination is demonstrably incorrect for the reasons explained above. *Supra* Part II.

*Second*, the Re-Termination Notice fails to provide a reasoned explanation that "includ[es] a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation omitted). Rather, it summarily states—without any explanation or observations regarding the specifics of Porwancher's book project—that Porwancher's grant "does not substantively align" with NEH's priorities. Ex. O. Such a "conclusory statement[] will not do; an agency's statement must be one of *reasoning*." *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (quotation omitted).

---

capricious claim in a manner that was untethered from the contrary-to-law claims. *See Porwancher*, 2025 WL 2097740 at *3 n. 1. Here, by contrast, the arbitrary-and-capricious claim goes hand-in-hand with the agency's compliance with Section 200.340(a). Moreover, the Supreme Court's motivating concern in *California* was that the TRO "enforce[d] a contractual obligation to pay money." *California*, 145 S. Ct. at 968. And indeed, the district court did order the agency to make payments, enjoining defendants from "suspen[ding] or withholding [] any funds approved or obligated for the grants." *California v. Dep't of Educ.*, 769 F.Supp.3d 72, 80 (D. Mass. 2025). Here, by contrast, the Court did not order payment. It merely prohibited Defendants from "treating Plaintiff Porwancher's grant as terminated." ECF No. 21.

*Third*, multiple statements in the Re-Termination Notice "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. "Suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong." *Nat. Resources Def. Council, Inc. v. Rauch*, 244 F.Supp.3d 66, 96 (D.D.C. 2017) (citation omitted). At the risk of repetition, NEH's conclusion that Porwancher's grant does not align with its priorities was contrary to the evidence, for the reasons explained above. *Supra* Part II. Likewise, the Notice erroneously stated that "NEH is redirecting funding toward projects that more directly fulfill" agency priorities. Ex. O. That assertion is demonstrably false. In May 2025, NEH announced funding for projects that are—objectively—less directly aligned with the cited priorities. Ex. K; *supra* at 8-10.

*Fourth,* the Re-Termination Notice changed course without considering Porwancher's reliance interests. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation and citations omitted)). But the Re-Termination Notice failed to consider that this late-stage termination would disrupt the careful plans that Porwancher made in reliance on the award, thus causing him irreparable harm. *Porwancher*, 2025 WL 2097740 at *5. The Re-Termination Notice is silent on reliant interests.

*Fifth*, the Re-Termination Notice did not "provide a reasoned explanation for the change" in NEH's position on Porwancher's grant, including "for disregarding facts . . . that underlay . . . the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). The Re-Termination Notice failed to acknowledge—let alone explain its departure from—the factual findings that NEH made when first bestowing the award on Porwancher, especially regarding his project's focus on religious liberty. *Compare* Ex. G (NEH evaluations of Porwancher's proposal

making findings about the strength of the project and its focus on religious freedom), *with* Ex. O (omitting any mention of prior findings).

### b. The Re-Termination Violates the Due Process Clause.

Under the Fifth Amendment's Due Process Clause, the government may not deprive a person of their property unless that deprivation is "*preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Esparraguera v. Dep't of Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (emphasis added) (quotation omitted). Further, due process requires agencies to "provide . . . fair warning" of their policies and prohibit agencies from "unfair[ly] surpris[ing]" parties who develop a "good-faith reliance" on prior positions. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012) (quotations omitted).[12]

As explained in Plaintiff's prior papers, Porwancher has a property interest in his award based on the terms of the grant itself, which created a "mutually explicit understanding[]" that NEH would provide the grant unless it was terminated by Porwancher himself or by NEH for his noncompliance with terms and conditions." PI Br. at 34-35 (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) and citing the grant terms found at ECF No. 9-4). Based on those terms, Plaintiff has a "legitimate claim of entitlement" that is "more than a unilateral expectation" of the funds. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). This entitlement was further established by the OMB grant management regulations that NEH has adopted, which "set forth clear substantive limits on [NEH's] discretion to terminate grants." *Louisiana Delta Serv. Corps v. Corp. for Nat'l and Cmty. Serv.*, 2025 WL 1787429 at *26 (M.D. La. June 27, 2025). Plaintiff thus has a "protected property right" in his grant because "the law . . . sets 'substantive

---

[12] This "fair notice" doctrine is rooted in the Due Process Clause. PI Br. at 34; *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) ("Due process requires that parties receive fair notice before being deprived of property.").

limits on official discretion.'" *Id.* at \*24 (quoting *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008)). Indeed, several courts have found that grantees have property interests in their awards under such circumstances. *See, e.g., id.* at \*24-26; *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part on other grounds, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

As was true of his previous termination, Porwancher was deprived of this property without due process for three reasons. *First,* he did not receive "proper notice" because the Re-Termination Notice did not "precede" the award termination. *Esparraguera*, 101 F.4th at 40. Instead, the Notice provided that the termination was "effective August 1, 2025"—the same day it was issued. Ex. O. Moreover, the Notice was inadequate because it failed to provide "the factual basis for the action." *Esparraguera*, 101 F.4th at 40. The D.C. Circuit has explained that the factual basis, along with any evidence relied upon by the government, "must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Ralls Corp. v. Committee on Foreign Inv. in U.S.,* 758 F.3d 296, 318 (D.C. Cir. 2014). The Re-Termination Notice wholly fails this standard: it summarily states, without any explanation, that Porwancher's grant does not "substantively align" with agency priorities. Ex. O. Without any discussion of the "factual basis" for NEH's conclusion, Plaintiff is handicapped in his ability to refute NEH's reasoning.

*Second*, Plaintiff did not receive an opportunity for a hearing that "preceded" his termination. *Esparraguera*, 101 F.4th at 40. Although the Re-Termination Notice provides a written appeals process, the termination was effective immediately. Ex. O. This post-termination appeal does not satisfy the Due Process Clause requirement for "some kind of hearing *before* final deprivation of a property interest." *Id.* (emphasis in original).

*Third*, as explained elsewhere, NEH failed to provide Plaintiff with fair notice of its policy that his award could be terminated for reasons other than noncompliance. *See* PI Br. at 36-37.

### c. The Re-Termination Violates the Spending Clause's Clear Notice Requirement.

The Re-Termination also violates the limits on the government's powers under the Spending Clause. It is well established that, although Congress may impose conditions on funds, the "legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms[.]" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Congress may not "surprise[e] [fund recipients] with post acceptance or 'retroactive' conditions." *Id.* at 25. Rather, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* at 17. In other words, Congress must provide clear notice of funding conditions. These limits "appl[y] not only to Congress, but the agencies implementing spending legislation." *San Francisco Unified Sch. Dist. v. AmeriCorps*, 25-CV-02425, 2025 WL 1713360, at *17 (N.D. Cal. June 18, 2025). NEH therefore "cannot violate constitutional limitations on Congress's disbursement of federal funds simply because it is a delegate of Congress." *Id.*; *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n. 6 (9th Cir. 2019) (there is "no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the ... general Welfare'" under the Spending Clause).[13]

Here, NEH has impermissibly surprised Porwancher with a "post acceptance" condition because he was unaware when he accepted the award that the agency could terminate him based

---

[13] The Clear Notice requirement applies with respect to all grant recipients, not just States. *See, e.g.*, *Gonzaga University v. Doe*, 536 U.S. 273, 279-81 (2002) (invoking the Spending Clause's clear notice requirement to narrowly construe spending legislation where the funding recipient was a private entity).

on the agency's determination that his grant does not effectuate the agency's priorities. *Pennhurst*, 451 U.S. at 25. As noted above, the terms of his grant agreement stated that his grant could be terminated by NEH only for noncompliance with conditions. *Supra* at 22. Indeed, the terms of his grant agreement made no mention of the termination provisions found at 2 C.F.R. § 200.340, much less the Priorities Provision that NEH has now invoked as its basis for terminating the award. *See generally* ECF No. 9-4.

And even if Porwancher had somehow been aware of those regulations, he still would not have been on notice that NEH could terminate him for failure to effectuate agency priorities. Indeed, the subsection that immediately follows 200.340(a) directs agencies to "clearly and unambiguously specify termination provisions . . . in the award." 2 C.F.R. § 200.340(b). In other words, the regulations themselves indicate that an agency may invoke only termination provisions that are included in the terms and conditions of the award itself.

Under these circumstances, Porwancher was unable to "voluntarily and knowingly accept the terms" of his award. *Pennhurst*, 451 U.S. at 17. As another district court has recently put it, "[k]nowing acceptance requires awareness of the conditions on" the grant and the ability to "clearly understand" those conditions. *San Francisco Unified Sch. Dist.*, 2025 WL 1713360, at *18 (citing *Pennhurst*, 451 U.S. at 17, and *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). Such knowing acceptance was not present here.

## IV.    The Administrative Appeal Process Does Not Preclude Review

The Court may review the Re-Termination for compliance with its Order, notwithstanding NEH's newfangled offer to provide Porwancher with an administrative appeals process. The Court plainly has jurisdiction to review NEH's actions for compliance with the Court's own Order.

Moreover, there can be no question that the Re-Termination is final agency action subject to judicial review because it (1) represents "the consummation of the agency's decisionmaking

process," and (2) conclusively determines Porwancher's legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). Here, there are no further steps in NEH's decisionmaking process regarding whether to terminate Porwancher's grant given that NEH has, in fact, terminated the grant. Ex. O. And that decision has plain "legal consequences": Porwancher is no longer entitled to the grant and the funds that come with it.

Nor is Porwancher required to exhaust the optional administrative appeals process before seeking review in this court. Doing so "is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (emphasis in original). Here, the appeals process is required by neither statute nor regulation. Indeed, the Public Scholar award terms and conditions do not even contemplate such a process. *See generally* ECF No. 9-4.

## V.    The Court should Grant Expedited Briefing on This Motion.

As the Court has already recognized, the termination of Plaintiff's grant will irreparably harm him absent preliminary relief prior to the start of the fall semester. *Porwancher*, 2025 WL 2097740 at *5. Plaintiff will be irreparably harmed because "he will either have to teach two history classes rather than write his book"—"time . . . that he cannot get back"—"or clear the history courses from his schedule by using his two 'course releases[.]'" *Id.* The fall semester is scheduled to commence on August 21, 2025.

To ensure sufficient time for the Court to rule on this motion before that date, Plaintiff requests that the Court order Defendants to respond to this motion by Friday, August 8, with Plaintiff's reply due Tuesday, August 12. In the absence of expedited briefing, Defendants' opposition would be due on August 18, just three days before the fall semester begins on August 21. Local Rule 7(b) (providing that oppositions to motions are due in 14 days). Such a timeline

would not provide sufficient time for Plaintiff to file a reply and for the Court to rule prior to August 21. And absent relief before that date, Plaintiff will be forced to expend his course releases.

Conversely, an expedited timeline would not harm Defendants and would be reasonable under the circumstances of this matter. Defendants chose to Re-Terminate Porwancher's grant on the very day that it should have started, with full knowledge that Porwancher would suffer irreparable harm as a consequence. An expedited schedule is warranted in light of the very short timeline before those harms are realized.

## CONCLUSION

It is striking that NEH invokes the legacy of the Declaration of Independence to justify re-terminating Professor Porwancher's grant. After all, the Declaration is the single most renowned repudiation of arbitrary power in world history. And yet NEH exercises its own power arbitrarily against Porwancher, and compounds that perversion by doing so in the name of the Declaration's legacy. When one party seeks to write a book on the triumph of religious liberty, and the other party abuses its authority to defund that very book, there can be little question who among them is actually honoring our republic's founding ideals.

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his motion to compel compliance and to order expedited briefing. Two proposed orders are attached: one regarding compliance and the other regarding the briefing schedule.

Dated: August 4, 2025

Respectfully submitted,

Professor Andrew Porwancher
SCETL–ASU
P.O. Box 870602
Tempe, Arizona 85287–0602
(602) 726-2110
porwancher@asu.edu

*Plaintiff*