**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW PORWANCHER<br><br>SCETL–ASU<br>P.O. Box 870602<br>Tempe, Arizona 85287–0602<br>(602) 726-2110<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE<br>HUMANITIES; and<br><br>MICHAEL MCDONALD, in his official<br>capacity as Acting Chairman;<br><br>*Defendants.* | Case No. 1:25-cv-01180-CJN |

## SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff files this Second Amended Complaint with the consent of Defendants, ECF No. 33 at 2, and alleges as follows.

1.      In 1851, the statesman Warder Cresson faced a charge of "lunacy" in a Pennsylvania courtroom for having converted to the Jewish faith. At stake was nothing less than the promise of the American founding. If Cresson was deemed a lunatic and confined to an asylum, it would represent a major blow to the nation's founding ideals of liberty and equality. But twelve enlightened jurors set Cresson free. One contemporary newspaper observed that the Cresson verdict vindicated the "constitutional right of every republican citizen to exercise freedom of conscience." To tell Cresson's story, Plaintiff Andrew Porwancher must now vindicate his own constitutional right to exercise freedom of association.

2.    Porwancher applied in 2023 for the Public Scholar award from the National Endowment for the Humanities (NEH) to support his book project—*The Great Jewish Lunacy Trial*—about Cresson's historic triumph over antisemitism.  The following year, Porwancher received thrilling news from the agency: he stood among the small handful of winners in that year's competition. His Public Scholar award marked the greatest achievement of his academic career.

3.    Porwancher eagerly awaited his August 2025 start date for his grant work.  But Defendant Michael McDonald—Acting Director of the NEH—adopted other plans.  McDonald caved to pressure from the Department of Government Efficiency (DOGE) to purge Biden-era grants *en masse*.  In April 2025, he summarily wiped out nearly all Biden-era awards, Plaintiff's included. The mass termination was retributive: Plaintiff and hundreds of others had, by dint of their grants, committed the original sin of association with a rival presidency. Even if a given project advanced NEH priorities under the new administration—as Plaintiff's did—that alignment was immaterial.

4.    This Court preliminarily enjoined the NEH from giving effect to the initial termination of Porwancher's grant because of the agency's failure to abide its own regulations. But McDonald remained undeterred in his retaliatory mission to cancel a grant associated with Biden.  So McDonald re-terminated Porwancher's award on the same day that it was set to begin. The Re-Termination Notice claimed that the agency's priority was to redirect funds toward projects better aligned with its signature initiative about the American founding's legacy: *A More Perfect Union*.  That rationale was straightforward. It was also brazenly pretextual.

5.    McDonald has demonstrated time and again his willingness to fund grants on subjects that are—objectively—less relevant to the American founding than is Porwancher's project.  Indeed, McDonald filed a declaration *in this very case* in June 2025 proudly touting the

wide range of grant topics he was freshly funding: an ancient Roman map, a Holocaust diary, and Micronesian studies, to name only a few. And then, on the very day that McDonald re-terminated Plaintiff's grant in August 2025, the agency announced a slate of new awards on topics that have nothing to do with U.S. history, much less with the American founding—from Iron Age Celtic history to ancient Etruscan culture. No government official can maintain their credibility when they espouse a given rationale in one breath that they decisively undermine in the next.

6. Moreover, considerable evidence demonstrates that the mass termination was driven by unconstitutional motives. Indeed, more than one federal court has already found that the April 2025 purge of what DOGE deemed "Biden grants" likely violated the First Amendment. This context matters: it serves to show that the re-termination of Plaintiff's grant was simply finishing the job that McDonald had begun in April. So, too, does the fact that McDonald operates in a broader culture which condones retaliation against those associated with Biden.

7. A wealth of other evidence indicates that McDonald proceeded from a retaliatory motive. Defendants have engaged in shifting and inconsistent explanations for their behavior, a hallmark of pretext. For instance, they claimed in a filing that Porwancher's grant was re-terminated because "combatting antisemitism" was not an agency priority and then—mere weeks later—the agency announced a grant of unprecedented size to "Combat the Normalization of Anti-Semitism in American Society[.]" Their credibility cannot survive that kind of double-speak.

8. McDonald's actions are not only repugnant to the First Amendment. Each termination of Porwancher's award violated agency regulations. Moreover, the terminations epitomized arbitrary and capricious agency action. The NEH issued Termination Notices that made a mockery of the agency's legal obligations to Porwancher. The disregard for Plaintiff's basic rights under the Administrative Procedure Act (APA) has been habitual and flagrant.

9.      Because the re-termination violates the First Amendment, Porwancher has already suffered—and will continue to suffer—irreparable harm. Absent preliminary relief, these harms will only compound. Porwancher therefore files this Complaint and will seek preliminary relief (1) setting aside the re-termination of his grant and (2) directing Defendants to reinstate the <u>non-monetary</u> aspect of his Public Scholar award until this Court has an opportunity to more fully consider the issues on the merits.  In other words, Porwancher will ask this Court to preliminarily restore his status as a Public Scholar.  That relief would enable him to resume work on his project under the grant, but it would not oblige the NEH to disburse Plaintiff's grant funds pursuant to a Court Order.

## PARTIES

10.     **Plaintiff Andrew Porwancher** is a Professor of History at Arizona State University in Tempe, Arizona.

11.     **Defendant National Endowment for the Humanities (NEH)** is a federal agency headquartered in Washington, D.C.

12.     **Defendant Michael McDonald** is the Acting Chairman of the NEH. He is sued in his official capacity.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the First Amendment to the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq*.

14.     Venue is proper in this District under 28 U.S.C. § 1391(e) because the NEH is headquartered in this District.

15.     This Court has inherent equitable authority to enjoin unconstitutional action by a federal officer, and is further authorized by the APA, 5 U.S.C. §§ 702, 706, as well as the Declaratory Judgment Act, 28 U.S.C. § 2201, to issue the relief (which does not include money damages) sought herein.

## FACTUAL ALLEGATIONS

### *The Public Scholars Program*

16.     Congress passed the National Foundation on the Arts and the Humanities Act of 1965, therein creating the NEH. 20 U.S.C. § 956. In explaining the purposes of the legislation, Congress declared that "the humanities belong to all the people of the United States." *Id.* § 951(1). Congress emphasized the importance of history specifically: "An advanced civilization must . . . achieve a better understanding of the past." *Id.* § 951(3). "While no government can call a great . . . scholar into existence, it is necessary and appropriate for the Federal Government to help create and sustain . . . the material conditions facilitating the release of this creative talent." *Id.* § 951(7). To that end, Congress contemplated the provision of "grants . . . to . . . support the publication of scholarly works in the humanities." *Id.* § 956(c)(8).

17.     The NEH's Research Programs division provides an array of grants for individuals. That division sponsors the Public Scholars program, which "supports nonfiction books in the humanities that hold strong appeal for curious general readers." The Public Scholars program holds an annual competition for its awards. Most of the recipients are professors based at universities.

18.     The Public Scholar award is among the most prestigious in the country for humanities professors. From its very inception, the Public Scholars program carried considerable

cachet—when the NEH revealed its inaugural cohort of Public Scholars, in 2015, the *New York Times* and *Washington Post* covered the announcement.

19.    Becoming a Public Scholar is a significant accomplishment. More than 90% of applicants are rejected in a typical grants cycle. Applicants find themselves vying against eminent scholars from around the country. Some applicants are Pulitzer Prize winners.[1] Others are faculty members at the nation's leading universities, such as Harvard and Stanford.[2] Amid this steep competition, winning a Public Scholar award can represent the achievement of a lifetime. The award confers status and recognition on its recipients, signaling they are scholars of the first rank.

20.    One indication of the Public Scholar award's prestige is its relationship to membership in the Association of American Universities (AAU).  The AAU is an elite group of 71 universities distinguished by their success along certain benchmarks in research. Many universities who do not belong to the AAU aspire to receive an invitation to join.

21.    AAU benchmarks include faculty awards—and not just any award counts. The AAU specifies that it looks to awards expressly designated "Highly Prestigious" by the National Research Council.[3] Awards falling into the "Highly Prestigious" category include the Pulitzer Prize, the Nobel Prize, the Fields Medal, and "NEH Faculty Research Awards" such as the Public Scholar grant.[4]

22.    A professor who manages to secure a Public Scholar award is therefore a major boon to their university. If the institution is already an AAU member, the award helps the

---

[1] For instance, Elizabeth Fenn won the Pulitzer Prize for history in 2015 and then won a Public Scholar award in 2019. Mount Vernon, *Pandemics in American History* (2020), https://tinyurl.com/ElizabethFenn.

[2] Past NEH Public Scholars include Harvard's Robin Bernstein and Stanford's Wanda Corn.

[3] Association of American Universities, *Membership Policy* (April 17, 2023), https://www.aau.edu/who-we-are/membership-policy.

[4] National Research Council, *List of Highly Prestigious Awards* (November 12, 2021), https://www.aau.edu/key-issues/national-research-council-list-highly-prestigious-awards.

university maintain that desirable status. If the institution aspires to AAU membership, the Public Scholar award offers a concrete means toward that end.

**The A More Perfect Union *Initiative***

23.     In 2019, the NEH launched its signature initiative about the legacy of the American founding: *A More Perfect Union.*

24.     That initiative has remained in continuous effect since that time.

25.     The press release announcing the initiative explained that it prioritizes "humanities projects that promote a deeper understanding of American history . . .  and knowledge of our core principles of government."[5]  That press release quoted the then-NEH Chairman, who explained, "This agency-wide initiative will help Americans better understand the world's oldest constitutional democracy and how our founding ideals are met in a pluralistic society[.]"[6]

26.     The NEH webpage dedicated to *A More Perfect Union* identifies "liberty" and "equality" as two of the nation's three founding ideals.[7]

**Porwancher's Public Scholar Award**

27.     In September 2023, Professor Porwancher applied to the Public Scholars program to support his work on a book project of manifest relevance to *A More Perfect Union*.

28.     That book project—*The Great Jewish Lunacy Trial*—tells the inspiring story of Warder Cresson, who personified the triumph of American liberty over antisemitism. The Quaker-born Cresson was appointed the United States' first diplomat to Jerusalem, in 1844. Toward the

---

[5] NEH, *A More Perfect Union* (September 17, 2019), https://www.neh.gov/news/more-perfect-union.
[6] *Id.*
[7] NEH, *A More Perfect Union: Exploring America's Story and Celebrating Its 250 Years of Cultural Heritage*, https://www.neh.gov/250. "[C]onsent of the governed" is the third ideal.

end of his four-year stay in the Holy City, he adopted the Jewish faith as his own. Cresson returned home to his native Philadelphia, only to have the local county file a charge of lunacy against him in court. The ensuing jury trial—which hinged on whether conversion to Judaism was itself evidence of insanity—became a momentous test case for religious liberty and civic equality. The proceedings gripped the national imagination. If the jury deemed Cresson a lunatic, he could spend the rest of his life confined to an asylum. Instead, the jury rendered a historic verdict that gave Cresson his freedom.

29.    The central themes of this book project—liberty and equality—are thus the selfsame that *A More Perfect Union* expressly identifies as central to the legacy of the American founding.

30.    Given the strong affinity between his project and that initiative, Porwancher's application to the Public Scholars program explicitly drew the connection: "By exploring the historical development of a core principle of constitutional democracy—the free exercise of faith—*The Great Jewish Lunacy Trial* harmonizes with the civic-minded goals of NEH's initiative, 'A More Perfect Union.'"

31.    Porwancher's application highlighted the relevance of *A More Perfect Union* despite the fact that the Notice of Funding Opportunity (NOFO) for his cycle did not even mention that initiative as an agency priority.

32.    Porwancher's grant application then underwent a peer review process in which four outside experts handpicked by the NEH weighed the project along criteria adopted by the agency. These criteria included, among other things, (1) the project's appeal to general readers, (2) the applicant's prior research record, and (3) the quality of the applicant's writing.

33.     These experts praised Porwancher along these very lines. For instance, one reviewer highlighted the project's potential to reach a broad audience: "This story-oriented approach should appeal to general readers and engage them in the wider topic." Another praised Porwancher for his "outstanding scholarly record" and "[e]ngaging writing style[.]"

34.     The experts also repeatedly highlighted the import of the project to the theme of liberty, or "freedom" as they put it.

35.     To a person, every expert's "final rating" classified Porwancher's project as either "excellent" or "very good"—the two highest possible ratings.

36.     Among the 283 Public Scholar applicants that cycle, merely 25 were awarded grants. Porwancher was delighted to learn in August 2024 that he counted among the winners. Although he had earned other accolades throughout his career, none was so prestigious as the Public Scholar award.

37.     The agency told Porwancher that his book stood among "the nation's most significant humanities projects" and would join the "list of distinguished contributions to the humanities."

38.     The NEH permitted Porwancher to commence his twelve-month period of performance on the first day of a given month—as early as September 1, 2024 and as late as August 1, 2025. Although Porwancher was eager to begin full-time work on his book, he opted for his performance period to run from August 1, 2025 through July 31, 2026. He chose this timing because to have done otherwise would have been highly disruptive to his academic unit. Managing the department's course schedule is an intricate endeavor.  The department must ensure, among other considerations, that it offers at the appropriate times the courses that students must take to graduate on time.  For any given semester, the schedule is set two semesters in advance, and most

students enroll in their courses one semester in advance. Had Porwancher sought to abandon his teaching duties days before the fall 2024 semester began, it would have created a chaotic situation.

39.    Porwancher therefore proposed to his department head that he take leave for the 2025-2026 academic year, thus providing the department nearly a year's advance notice of his performance period for the NEH. This would afford his colleagues ample time to plan for his absence from teaching during the 2025–2026 academic year.

40.    ASU soon added Porwancher's name to the website it maintains honoring NEH award recipients.[8]

### The Mass Termination of Grants at the NEH

41.    On January 20, 2025, Donald J. Trump was sworn in as the 47th President of the United States.

42.    He soon issued a series of executive orders designed to ensure that the government terminated grants promotive of Diversity, Equity, and Inclusion (DEI).

43.    In February 2025, the NEH began a review of open grants to determine which ones promoted DEI and thus conflicted with the new executive orders.

44.    Approximately 25% of grants were coded as pro-DEI.

45.    Porwancher's grant was coded as not promotive of DEI.

46.    But the termination plans soon expanded well beyond the pro-DEI grants.

47.    The catalyst for this expanded approach was the arrival of two members of the Department of Government Efficiency (DOGE)—Nate Cavanaugh and Justin Fox—who descended on the NEH in March 2025.

---

[8] ASU, *National Endowment for the Humanities*, https://tinyurl.com/ASUNEH (last visited January 5, 2026).

48.     On March 12, 2025, Nate Cavanaugh sent an email to McDonald that made plain the new agenda was to terminate grants that had been awarded under Biden regardless of their content.

49.     The email demonstrates that the new administration thought of NEH grants awarded during the prior four years as a largely unvariegated mass of "Biden grants"—that is, those grants bore the unforgivable mark of a political rival. The subject line of the email was "NEH | Biden Grants[,]" the spreadsheet attached to the email was labeled "NEH Grants (Biden Admin)[,]" and the body of the email read, "Attached is a list of grants that were awarded during President Biden's administration (Jan 20, 2021 through Jan 19, 2025) at NEH." Grants awarded prior to Biden's presidency were not reviewed for termination.

50.     Cavanaugh's email noted that he expected that $322 million of grant funds could be "clawed back"—not coincidentally, that figure was the dollar amount that he believed to have been obligated to, but not yet spent by, Biden grantees.

51.     It was no longer material whether a given grant ran counter to President Trump's executive orders about DEI.  In DOGE's calculus, affiliation with Biden was sufficient to warrant cancellation.

52.     McDonald was under immense pressure to capitulate to this DOGE agenda. DOGE official Justin Fox told McDonald just days before the mass purge, "We need a game plan for effectuating . . . final grant terminations. . . . We're getting pressure from the top on this and we'd prefer that you remain on our side but let us know if you're no longer interested."

53.     McDonald apparently did remain on their side, as he now takes credit for the mass termination of NEH grants effectuated in early April 2025.

54.    Porwancher's grant and hundreds of others were canceled *en masse* as retribution for their association with the Biden Administration.

55.    McDonald was candid with NEH staffers: political affiliation with Biden drove the mass purge.  As one employee stated in a declaration in a parallel case, "McDonald told staff that DOGE was focused on terminating awards issued by the Biden administration."

56.    At no prior point had the NEH given Porwancher any forewarning that it might terminate his grant.

57.    Porwancher received his Termination Notice on April 3, 2025.

58.    The Termination Notices were materially identical across the entire body of terminated grant recipients and word-for-word identical among the Public Scholar recipients.

59.    The boilerplate Termination Notice gave multiple conclusory, nonsensical—and often conflicting—explanations for the termination.  Nearly every sentence was a farce. It stated without any explanation that Porwancher's grant no longer effectuated (unnamed) agency priorities.  It ran counter to evidence by claiming that Porwancher was non-compliant with the conditions of his grant agreement even though he had not even begun his grant work yet. It amorphously claimed that unidentified "exceptional circumstances" somehow warranted the agency's violation of due process.

60.    The Termination Notice also failed to fulfill several regulatory requirements. *See Porwancher v. NEH*, 792 F.Supp. 3d 107, 114-15 (D.D.C. 2025).

61.    Deprived of any coherent explanation for the termination or any actionable information about an appeals process, Porwancher sought clarity the very next day. He used the messaging function of the NEH online portal to inquire whether an appeals process actually existed and if so how to initiate it. Ten days later, the NEH responded that the agency "is unable to offer

you a means of dispute resolution[.]"  Not only did this refusal to provide for appeal violate the NEH's own regulations, but it also contravened the Termination Notice's indication that there would be an appeals process.

62.    Not only had Porwancher been summarily robbed of the greatest accolade of his career, but now he faced grave uncertainty about the next academic year. His reprieve from his teaching responsibilities had hinged on the Public Scholar award. Without it, he faced the highly disruptive situation of needing to fulfill his teaching duties long after the course schedule had been finalized.

***Defendants Were Pressed to Defend the Termination in Motion Practice***

63.    Porwancher filed suit against Defendants on April 16, 2025 and filed a motion for a preliminary injunction on June 2, 2025.

64.    Pressed to justify the termination in the ensuing motion practice, McDonald filed a declaration with the Court along with Defendants' opposition brief on June 10, 2025.

65.    That declaration is noteworthy for three reasons.

66.    *First*, it made no reference at all to *A More Perfect Union*, much less did it claim that Plaintiff's project was terminated for its divergence from that initiative.

67.    *Second*, it boasted about McDonald's decision to newly fund "a documentary about a 14-year-old Jewish girl whose diary was found in the rubble of Auschwitz . . .; research regarding the early drawings and engravings of [British artist] William Blake; [and] an online database of 3D models of the Great Marble Map of Rome" from the third century.

68.    Those projects are not about the legacy of the American founding.

69.    *Third*, McDonald's declaration did not dispute Porwancher's assertion that his grant was terminated for purported non-compliance.

70.    Defendants' non-compliance rationale would prove legally problematic for them. Termination for non-compliance triggers a host of regulatory requirements that the NEH failed to meet. *Porwancher*, 792 F.Supp. 3d at 114-15.

71.    In an eleventh-hour bid to escape accountability, Defendants belatedly filed with the Court a declaration from Richard Brundage—Director of NEH's Office of Grant Management—claiming that the "NEH did not carry out the terminations pursuant to noncompliance[.]"

72.    That assertion contravened the plain language of the Termination Notice, which stated unambiguously, "Your grant no longer effectuates the . . . conditions of the Grant Agreement[.]"

73.    The Brundage declaration was filed on July 21, 2025, which was untimely in light of this Court's minute order of June 3, 2025. That minute order required the parties submit a Joint Status Report (JSR) by June 9, 2025 "addressing whether the Parties anticipate factual disputes[.]" In the JSR, Defendants said nothing about a dispute over non-compliance as the basis for termination. Only 42 days later did Defendants, for the first time, raise this factual dispute in a late-stage maneuver to evade the consequences of their non-compliance rationale.

74.    On July 25, 2025, this Court preliminarily enjoined the NEH from treating Plaintiff's grant as terminated on the grounds that the agency had failed to meet several regulatory requirements.

**McDonald Ordered the Re-Termination of Porwancher's Grant**

75.     Porwancher was now back on track to begin his grant work, as originally planned, on August 1, 2025.  But McDonald would not abide the reinstatement of a Biden-era grant.  And so—on the very day that Porwancher's performance period was set to begin—McDonald ordered the re-termination of Plaintiff's award.

76.     So long as McDonald serves as NEH Chairman or as Acting NEH Chairman, he alone possesses the authority to award and terminate NEH grants.

77.     At McDonald's instruction, Richard Brundage emailed Porwancher a Re-Termination Notice, which included a section entitled "Basis for Termination[.]" That section reads in its entirety:

> NEH is terminating this award for the following reason: In accordance with 2 CFR § 200.340(a)(4), NEH has determined that this grant no longer effectuates the agency's programmatic priorities or needs. As described in Executive Order 14189, "*Celebrating America's 250th Birthday*" and Executive Order 14222, "*Department of Government Efficiency*," NEH is reallocating resources to support the Administration's directives related to the Semiquincentennial. The agency is currently emphasizing humanities projects that reflect on America's founding, celebrate the nation's cultural heritage, and expand access to foundational documents. NEH has concluded that your proposed book project does not substantively align with the agency's current strategic initiatives, including the *A More Perfect Union* initiative. Additionally, in light of E.O. 14222 and NEH's statutory responsibility to ensure responsible stewardship of taxpayer resources (20 U.S.C. § 951(5)), NEH is redirecting funding toward projects that more directly fulfill these obligations.

78.     The Basis for Termination was a pretext to obscure McDonald's true motive: the cancellation of Porwancher's grant for its association with a rival presidential administration.

79.     That pretext is evident in several ways.

80.     *First*, it was plainly erroneous that the NEH was redirecting funding toward projects that more substantively align with *A More Perfect Union*.  Notably, McDonald's June 10 declaration had boasted about his decision to fund projects that are objectively less relevant to the

American founding than is Porwancher's book on religious liberty in the United States. Those projects covered topics such as British art, ancient Rome, and Micronesian studies.

81.    McDonald's declaration trumpeted that he would "make a similarly broad range of grants" in the future. And he delivered on that promise.

82.    On the very day that the Re-Termination Notice insisted that the NEH was redirecting funds toward projects better aligned with the American founding, the agency announced dozens of new awards on topics manifestly less aligned with that professed priority.

83.    Those new awards included, in the NEH's words, an "exhibition about Etruscan culture from the ninth to second centuries BCE."

84.    That exhibition is less relevant to the American founding than is Plaintiff's project. Porwancher's 2023 Public Scholar application *explicitly* framed his project as about the legacy of the American founding: "Since the founding, Americans have grappled with a fateful question: will the promise of equality enshrined in the Declaration of Independence be fulfilled or forsaken?" Plaintiff's answer was the former—the "Cresson verdict was of vast consequence" because it showed that "a commitment to religious equality had real purchase on American life." As mentioned, the application expressly connected the project to *A More Perfect Union*. Moreover, the expert reviewers who assessed that application repeatedly commented on the project's relevance to liberty—or "freedom" as they put it—which is one of the key founding ideals emphasized by *A More Perfect Union.*  And the NEH's own website has a description of Porwancher's project that expressly notes his book is about "equality"—which is yet another founding ideal that *A More Perfect Union* stresses. Even the most forgiving trier of fact cannot credit the notion that ancient Etruscan culture is more pertinent to the American founding.

16

85.    The new awards also included "a digital collection of more than 2,500 scores of Renaissance music (1420-1520)[.]"

86.    That collection is less relevant to the American founding than is Plaintiff's project.

87.    The new awards included "a website on Catholic resistance to communist religious repression in Central and Eastern Europe[.]"

88.    That website is less relevant to the American founding than is Plaintiff's project.

89.    The new awards included an "exhibition exploring the Celts of western and central Europe during the Iron Age through the early medieval period."

90.    That exhibition is less relevant to the American founding than is Plaintiff's project.

91.    The new awards included a "two-volume, critical edition of the shorter works of English poet and monk John Lydgate (1370–1451)."

92.    That critical edition is less relevant to the American founding than is Plaintiff's project.

93.    The foregoing projects do not begin to exhaust the list of NEH awards announced on August 1, 2025 that are less apposite to the American founding than is Porwancher's *The Great Jewish Lunacy Trial*.

94.    The pretext at play in the Re-Termination Notice was evident in yet other ways.

95.    The Re-Termination Notice, for instance, marked *the very first time* that Defendants premised the cancellation of Plaintiff's grant on its supposed misalignment with *A More Perfect Union*.

96.    Defendants had been pressed to justify that initial termination in motion practice two months earlier, in June 2025. McDonald submitted a declaration at the time that said nothing about *A More Perfect Union*. It beggars belief that McDonald *genuinely* premised the initial

termination on *A More Perfect Union* and yet—despite being sued in federal court and facing the prospect of a preliminary injunction—simply failed to mention it. Only after this Court entered a preliminary injunction did McDonald suddenly contrive this newfangled basis for termination.

97.    When a defendant suddenly develops a wholly novel explanation for their behavior only after a setback in litigation, that explanation must be met with heightened skepticism. And when the explanation directly contradicts that defendant's own declaration that he had recently filed in the case, his credibility cannot survive intact.

98.    The Re-Termination Notice suffers from yet more defects. Indeed, it repeated many of the same errors that plagued the initial Termination Notice. Once again, there was no actual reasoning, just a conclusory assertion that Porwancher's project did not effectuate agency priorities.  Defendants did not even *attempt* to substantiate the statement that Porwancher's project failed to align with *A More Perfect Union*, much less did they engage the facts underlying the agency's original decision to award a grant to Porwancher.

99.    The Re-Termination Notice followed the lead of the initial Termination Notice in yet another respect—it, too, failed to include even a perfunctory nod to Porwancher's considerable reliance interests. He faced a difficult situation on August 1, 2025. Porwancher had arranged to take leave from ASU during the 2025-2026 academic year, but ASU had only granted him that leave based on the premise that he would be taking up his Public Scholar award. Now Porwancher was bereft of the grant and would owe the university two courses that fall semester. The fall semester was set to begin just three weeks later—on August 21, 2025—but teaching schedules are set ten months in advance.  The NEH has routine engagement with humanities professors and had every reason to anticipate that terminating a grant on the eve of a semester would be highly

disruptive. Yet the Re-Termination Notice included not one word on Porwancher's reliance interests.

100.    Meanwhile, Porwancher pressed ahead with a motion to compel compliance. That motion was not resolved shortly after the beginning of the fall 2025 semester. Porwancher then pursued his only viable path forward with ASU at that point: he burned through his two "course releases" in fall 2025. For context, a course release allows a professor to forgo teaching a class that he would otherwise owe to the university. Because Porwancher's contract with ASU afforded him only two course releases, they were a finite and valuable resource. He had desperately wanted to save those course releases for a later semester. Porwancher and his wife have been trying to start a family, and he planned to use his two course releases during their future child's infancy—a possibility now foreclosed.

***Defendants Claimed that Combatting Antisemitism Is Not an Agency Priority***

101.    Defendants were not yet done with their shapeshifting rationales for canceling Porwancher's grant. Twelve days after the re-termination, Defendants were pressed to defend it in motion practice.  At this point, they staked out some surprising new ground.

102.    In an opposition brief defending the Re-Termination Notice, Defendants argued that Porwancher's grant diverged from agency priorities because his book project is about combatting antisemitism.  Defendants proceeded syllogistically: (1) "Plaintiff's anticipated book is about the history of combatting antisemitism" (inner quotation marks omitted). (2) But the NEH is focused on "honor[ing] the 250th anniversary of American Independence." (3) So therefore "Plaintiff's grant for his book about the history of combatting antisemitism no longer effectuates the agency's programmatic priorities[,]" (inner quotation marks omitted).

103.    But that rationale proved problematic for Defendants. For one, Porwancher's project was relevant to *A More Perfect Union* precisely because America's tradition of combatting antisemitism is an inspiring illustration of how the nation has fulfilled its founding ideals.

104.    The NEH knows that truth well.

105.    The agency maintained a webpage at that very moment dedicated to the notion that the fight against Jew-hatred is central to the legacy of the American founding. That webpage explained that Jewish-Americans had to "combat antisemitism" in order to "make the United States live up to its founding ideals[.]"

106.    Little more than a month after Defendants insisted that "combatting antisemitism no longer effectuates the agency's programmatic priorities[,]" (inner quotation marks omitted) the agency laid bare the full extent of its hypocrisy with a historic announcement: the NEH was awarding its largest-ever grant—$10.4 Million—dedicated to a "Humanities-Focused Effort to Combat the Normalization of Anti-Semitism in American Society[.]" That grant would fund, among other things, "a series of scholarly books on the meaning of Jewish resilience in the history of the United States[.]"

107.    Porwancher's project—which chronicles how a Jewish statesman overcame an assault on his religious liberty—is a scholarly book on the meaning of Jewish resilience in the history of the United States.

108.    Combatting antisemitism is a priority at the NEH.

109.    Porwancher's Public Scholar project is about combatting antisemitism.

***Porwancher Submitted an Internal Appeal at the NEH***

110.    On August 28, 2025, Porwancher formally appealed his re-termination to the NEH.

111.    On December 1, 2025, McDonald rejected that appeal. He provided Porwancher with a statement explaining his rationale.

112.    Porwancher's appeal had pointed out that the NEH's own handpicked experts had (1) highly rated his project and (2) repeatedly remarked on its relevance to the theme of freedom in America.

113.    McDonald's statement did not acknowledge, much less refute, that evidence.

114.    Porwancher's appeal had pointed out that—contrary to the Re-termination Notice's assertion—the NEH was directing funds toward projects that were comparatively *less* relevant, not more, to the American founding. Porwancher cited as an example a newly awarded Public Scholar grant on the history of medieval Jerusalem.

115.     McDonald's statement did not acknowledge, much less refute, that evidence.

116.    His statement suffered from several other defects. For example, it was internally inconsistent. On the one hand, McDonald insisted that Porwancher's project is not "in line with NEH's *A More Perfect Union* initiative"—an initiative about America's founding ideals. But then McDonald conceded that, actually, the project is indeed "thematically related to American ideals[.]" It was a surprising concession that undermined the central premise of his statement.

117.    McDonald's statement ran contrary to evidence by misstating the chronological focus of *A More Perfect Union*. He claimed that the initiative is dedicated to "projects that enhance our understanding of the country's founding period, focusing on the people and events of 1776[.]" That assertion, if true, would be convenient for McDonald, given that Porwancher's book largely takes place in the 1840s and 1850s. However, the current NOFO for the Public Scholars competition makes plain that the agency is hardly limiting its focus to the founding period: "Competitive applications will focus on topics in American history, culture, and government *in*

*any period from the Colonial Era to the present* that increase public knowledge of the 250th anniversary of American Independence[.]"

118.    McDonald's statement also proffered conclusory assertions. For instance, he alleged that Porwancher's grant would fail to inspire "confidence in the use of taxpayer funds[,]" but he did not bother to provide a single sentence of reasoning to support that determination.

119.    Back in 2024, the NEH had relied on expert evaluations that roundly lauded Porwancher and his project. The agency had concluded that Porwancher's book was among "the nation's most significant humanities projects[.]" At the time that McDonald denied Plaintiff's appeal, nothing had changed since that earlier assessment.  Porwancher's project had not changed.  The *A More Perfect Union* priority had not changed.  And yet, without explanation, the very project that had once inspired the agency to select Porwancher for the rarefied title of "Public Scholar" was now purportedly a threat to taxpayer confidence.

## PLAINTIFF'S INJURIES

120.    Defendants' terminations of Porwancher's grant will cause him serious and irreversible harm absent injunctive relief.

121.    *First*, the terminations violate Porwancher's First Amendment right to freedom of association, causing him ongoing irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).

122.    *Second,* if the non-monetary aspect of his grant is not reinstated, Professor Porwancher will suffer reputational harm because he will be deprived of the considerable prestige that the award would confer on him.  "Injury to reputation or goodwill is not easily measurable in

monetary terms, and so often is viewed as irreparable." *Trudeau v. Federal Trade Com'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005).

## CLAIMS FOR RELIEF

### Count One

### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Action
### Violation of the First Amendment - Freedom of Association
### (Against Defendant Michael McDonald)

123.    Plaintiff realleges all paragraphs above as if fully set forth here.

124.    The First Amendment provides that the federal government "shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

125.    "The First Amendment protects political association[.]" *Buckley v. Valeo*, 424 U.S. 1, 15 (1976).  Accordingly, the government cannot retaliate against an individual because of their political association.

126.    Even when an individual is not automatically entitled to a given federal benefit, the government cannot deny a benefit because of that individual's political associations. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

127.    That protection applies when the "government retaliates against a contractor . . . for the exercise of rights of political association[.]" *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 715.

128.    Because of Plaintiff's political association with the Biden Administration, Defendant Michael McDonald terminated Plaintiff's grant on April 3, 2025 and ordered the re-termination of that same grant on August 1, 2025. The mass termination of Biden-era grants in April 2025 underscores that political association was the driving factor.  Numerous articles of evidence—including DEI spreadsheets, contemporaneous emails from DOGE staffers, and declarations from NEH employees—show that unlawful motives animated the mass purge. Meanwhile, the retaliation at play in the re-termination of Plaintiff's grant is most evident in the manifest pretext of the rationale provided. The proffered reason for the re-termination is that the NEH is redirecting funds toward projects that better align with the agency's *A More Perfect Union* initiative, but the evidence demonstrates beyond question that the NEH is newly funding numerous projects that are not relevant to U.S. history, much less to the American founding.

**Count Two**

**Administrative Procedure Act–706(2)(A)**
**Contrary to Law**
**(Against All Defendants)**

129.    Plaintiff realleges all paragraphs above as if fully set forth here.

130.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

131.    The administration of NEH grants is governed by the set of regulations known as the Uniform Administrative Requirements (UAR). 2 C.F.R. §§ 200.0 *et seq*. The UAR were originally promulgated by the Office of Management and Budget (OMB) and subsequently adopted by the NEH. 2 C.F.R. § 3374.1. Although OMB updates to those regulations became effective on October 1, 2024, the NEH opted not to apply the new regulations retroactively to

extant grantees.[9] Therefore, grantees such as Porwancher (whose funds were obligated in August 2024) are governed by the regulations that became effective on November 12, 2020.

132.    The initial termination of Plaintiff's grant (April 3, 2025) violated NEH regulations in multiple ways. "Those regulations required that the NEH provide Porwancher with a notice stating 'that . . . [t]he termination decision will be reported to the OMB-designated integrity and performance system . . . [and that] the information will be available . . . for a period of five years[.]' 2 C.F.R. § 200.341(b)(1), (2) (2020).  The termination letter provided no such information.  The notice was supposed to indicate 'that noncompliance cannot be remedied by imposing additional conditions' on the award. 2 C.F.R. § 200.339(c) (2020). It didn't.  And the NEH was supposed to provide Porwancher with a right to appeal.  2 C.F.R. § 200.342. It told him there was no such process. ECF 9-1 at 9." *Porwancher*, 792 F.Supp. 3d at 114.

133.    "In fact, the NEH's communication to Porwancher candidly admitted that these procedural requirements weren't met, stating: 'The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible.' ECF 9-15." *Id.*

134.    "The NEH was required to provide 'an opportunity to object and provide information and documentation challenging the . . . termination[.]' 2 C.F.R. § 200.342 (2020). The NEH never gave Porwancher that opportunity. And when he expressly asked about the possibility of an internal appeal, the agency informed him that it was 'unable to offer [him] a means of dispute resolution.' ECF 9-17." *Id*. at 114-15.

135.    The re-termination of Plaintiff's grant (August 1, 2025) violated 2 C.F.R. § 200.340(a)(2) (2020). The Re-Termination Notice expressly relied on that provision (although it

---

[9] NEH, *Update on the 2024 Revisions to 2 CFR 200* (June 25, 2024), https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200.

mistakenly cited the 2024 version of the regulation), which permits the NEH to terminate an award without the recipient's consent "if an award no longer effectuates . . . agency priorities." *Id*. To terminate on these grounds, a specific factual condition must exist: the award must actually no longer effectuate agency priorities.

136.    The agency claims in the Re-Termination Notice that its priority is to direct funding toward projects that better align with the NEH initiative *A More Perfect Union*. But most NEH grants awarded under McDonald are objectively less relevant to *A More Perfect Union* than Porwancher's project is.    Defendants here lacked the factual predicate to lawfully rely on 200.340(a)(2) in terminating Porwancher's grant, and therefore they exceeded their authority under that regulation.

**Count Three**

**Administrative Procedure Act–706(2)(A)**
**Arbitrary and Capricious**
**(Against All Defendants)**

137.    Plaintiff realleges all paragraphs above as if fully set forth here.

138.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

139.    Both terminations were arbitrary and capricious because neither was substantively reasonable nor reasonably explained. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quotation omitted); *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that action "was substantively unreasonable" and claims that "the agency has failed to . . . adequately explain its [decision]").

140.    The initial termination was substantively unreasonable because McDonald terminated Plaintiff's grant despite the fact that the NEH coded his project as not in conflict with President Trump's DEI executive orders.

141.    The re-termination was substantively unreasonable because McDonald's basis for termination was erroneous. Although Defendants claim that the NEH is redirecting funds toward projects better aligned with *A More Perfect Union*, the agency is actually awarding grants to projects far less relevant than Porwancher's to that initiative.

142.    Both the initial Termination Notice (April 3, 2025) and the Re-Termination Notice (August 1, 2025) are arbitrary and capricious in multiple respects.

143.    Both notices rely on conclusory assertions rather than reasoned explanations. An agency action is arbitrary and capricious when the agency fails to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

144.    Both notices are contrary to evidence. It "is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly show[s] to be wrong." *Nat. Resources Def. Council, Inc. v. Rauch*, 244 F.Supp. 3d 66, 96 (D.D.C. 2017); *State Farm*, 463 U.S. at 43 (an agency cannot "offer[ ] an explanation for its decision that runs counter to the evidence before [it]").

145.    Both notices failed to consider Porwancher's reliance interests. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious

reliance interests that must be taken into account." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (inner quotation marks and citations omitted).

146.    Both notices failed to provide reasoned explanations for the agency's change in position. The NEH was required to "provide a reasoned explanation for the change," including "for disregarding facts and circumstances that underlay . . . the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quotation marks omitted).

## PRAYER FOR RELIEF

Plaintiff requests that the Court enter the following relief:

a.    Declare unlawful and set aside the April 3, 2025 termination and August 1, 2025 re-termination of Plaintiff's Public Scholar grant as contrary to the First Amendment of the U.S. Constitution, as not in accordance with law under 5 U.S.C. § 706(2)(A), and as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

b.    Issue preliminary and permanent relief that enjoins Defendants, their officers, employees, and agents from enforcing and giving effect to the April 3, 2025 termination of Plaintiff's grant.

c.    Issue preliminary and permanent relief that enjoins Defendants, their officers, employees, and agents from enforcing and giving effect to the August 1, 2025 re-termination of Plaintiff's grant.

d.    Issue preliminary and permanent relief that requires Defendants, their officers, employees, and agents to reinstate the non-monetary aspect of Plaintiff's grant;

e.    Award Plaintiff his costs and reasonable attorney's fees as appropriate;

f.    Grant such other relief as the Court deems necessary, just, and proper.

Dated: January 6, 2026        Respectfully submitted,

Professor Andrew Porwancher
SCETL-ASU
P.O. Box 870602
Tempe, AZ 85287-0602
(602) 726-2110
porwancher@asu.edu

*Plaintiff*